THELMA LU MENDENHALL, Petitioner-Appellee v. NORTH CAROLINA DEPART-MENT OF HUMAN RESOURCES, Respondent-Appellant

No. 9410SC176

(Filed 1 August 1995)

**Public Officers and Employees § 67 (NCI4th)— blind social worker—refusal to work with AIDS patient—no insubordination—dismissal improper**

There were insufficient grounds to dismiss petitioner, a blind social worker, from her job on the ground of insubordination for refusing to provide hands-on training with sharp objects to a blind AIDS patient, since the request was not reasonable; petitioner's concerns were legitimate; her refusal was based on her fears for her health and employer's failure to provide her with training in the precautions and safeguards to follow when working with an AIDS patient; and her refusal was not willful.

**Am Jur 2d, Civil Service § 63.**

Appeal by respondent from order entered 10 November 1993 by Judge Donald W. Stephens in Wake County Superior Court. Heard in the Court of Appeals 19 October 1994.

MENDENHALL v. N.C. DEPT. OF HUMAN RESOURCES

[119 N.C. App. 644 (1995)]

*Attorney General Michael F. Easley, by Special Deputy Attorney General John R. Corne, for respondent appellant.*

*Patterson, Harkavy & Lawrence, by Martha A. Geer, for petitioner appellee.*

COZORT, Judge.

Petitioner is a blind social worker who was terminated by the State Department of Human Resources in 1989 allegedly for insubordination. Petitioner refused a directive to provide hands-on training with sharp objects to a blind AIDS patient. The superior court ordered reinstatement of petitioner, holding there was insufficient evidence of insubordination. We affirm. The facts and procedural history follow.

In August of 1989, petitioner, who is legally blind, had been a social worker with the Division of Services for the Blind (DSB) in Guilford County for eleven years. DSB is a division of the North Carolina Department of Human Resources (DHR). Along with one other social worker, she was responsible for providing independent living services to blind and visually impaired clients of DSB for the purpose of assisting them to live independently. Clients were referred to petitioner and her coworker on an alternating basis. The skills taught by petitioner included housekeeping, cooking, grooming, and personal hygiene. Petitioner's blindness required her to use hands-on instruction with her clients.

The DSB procedure for servicing clients begins with the referral to a social worker. The next step after referral is for the social worker to conduct an initial interview within fifteen calendar days to determine the needs of the client and whether the client is eligible for the services. DSB does not require this initial interview to take place in person. It can be conducted by telephone, through the mail, or with a representative of the referral. Petitioner's usual practice, which was encouraged by her Regional Supervisor, Ms. Madge Davis, was to meet with the client in person.

Following the initial interview, the social worker can refer the client to a Resource Specialist (a state employee who provides specialized services) or an independent contract employee. Petitioner worked with two Resource Specialists, one who was a rehabilitation teacher and another who was an orientation and mobility instructor. Petitioner had access to only two contract instructors, a blind

instructor of braille and a teacher of arts and crafts. If none of these instructors accepted the referral, it was the responsibility of petitioner to provide the services requested.

On 24 July 1989, Moses Cone Hospital referred to DSB a prospective client known to be infected with Acquired Immune Deficiency Syndrome (AIDS). This individual had become blind due to the disease and wanted to learn braille, cooking, and grooming skills. The client was assigned to petitioner in the normal course of rotation. However, the client went on vacation during this period and was unavailable for the initial interview with petitioner.

Petitioner was uncomfortable with the assignment because she instructs by touch, and the services requested by the client would require the use of sharp objects. In a written memorandum to the DSB personnel manager, Mr. Gerald Hinson, dated 25 July 1989, petitioner requested a copy of the DSB AIDS policy. Having received no response by 1 August 1989, petitioner related her concerns to Ms. Davis, her supervisor, who informed petitioner that she would have to service the client the same as any other client. Ms. Davis spoke with the Chief of Independent Living Services, Ms. Sally Syria, on petitioner's behalf and was instructed to order petitioner to proceed with services.

Not satisfied with the delay in obtaining a written policy from DSB, petitioner traveled to the Regional Library for the Blind in Raleigh to educate herself on the subject of AIDS. Her research revealed that patients, such as the referral, who suffer blindness as a result of AIDS are in the most contagious, final stages of the disease. Petitioner informed the Regional Director of DSB, Mr. Stewart Vick, that she understood the client was entitled to services, but that she was concerned about the risks to her as a blind instructor. Vick said that he would inquire as to whether petitioner could be exempt. He ultimately recommended that she provide the services while avoiding any physical contact. This instruction was impossible for the blind petitioner to follow because the only way for her to instruct her clients was by touch.

On 14 August 1989 DSB finally responded to the request for an AIDS policy through a memorandum read to petitioner by Ms. Davis. Along with stating that a social worker would know the safeguards and precautions to take to avoid contracting AIDS, the memo stated:

MENDENHALL v. N.C. DEPT. OF HUMAN RESOURCES

[119 N.C. App. 644 (1995)]

[Petitioner's] concerns are *understandable,* but a Social Worker does not have the right to deny services or the taking of an application for the reasons of fear of contact with an applicant who has been diagnosed as having a social disease. (Emphasis added)

The memo further informed petitioner that her refusal to serve the client, after having been given a directive to do so, was insubordination for which she could be dismissed from employment. Ms. Davis gave petitioner until 16 August 1989 to contact the client. Because the client had not designated a representative, the memo instructed petitioner to make contact directly with the client. Ms. Davis did not suggest alternative ways to obtain the information without direct contact with the client. Petitioner responded with a memo to Ms. Davis, dated 15 August 1989, in which she stated that she considered working with the client to be a health hazard.

After determining that petitioner was not going to perform the initial assessment, Ms. Davis and the Guilford County Local Liaison Supervisor, Ms. Pearline Thompson, visited the client's room at Moses Cone Hospital. Along with a hospital social worker, they obtained the necessary information for the application. The client requested assistance in learning food service skills, dishwashing, eating tool manipulation, cleaning teeth and nails, shaving, and reading and writing braille. Many of these skills required the use of sharp objects, and all of the instruction necessitated hands-on training by petitioner.

On 17 August 1989 petitioner contacted the North Carolina Department of Labor to determine whether or not an employer is required to furnish training and protection to its employees who provide services to AIDS patients. A Department of Labor representative informed petitioner that she could not be fired for refusing to serve an AIDS patient in the absence of proper training in AIDS prevention. That same day, one year and two months after the policies were promulgated and distributed by DHR, Ms. Davis delivered a copy of the DSB Universal Blood and Body Fluid Precautions to petitioner. Since the other social workers and clerks in the region did not have copies of the policy, Ms. Davis distributed it to the entire staff on 22 August 1989.

The policy dealt mainly with the precautions to take when handling blood and bodily fluids, tasks in which petitioner would not engage. The only relevance to petitioner was the directive to "take precautions to prevent injuries caused by needles and other sharp instruments." However, the policy made no mention of how a blind

social worker could prevent potentially dangerous contact. The precautions in the policy appeared to be directed at employees who have sight. The procedures were of little or no assistance to petitioner.

Mr. Vick ordered petitioner to complete the assessment, a service plan, and initiate services for the client no later than 1 September 1989. He provided gloves, a gown, and a mask for petitioner to use, but provided no instruction on their proper use. Petitioner had still not received any training in how to prevent the spread of AIDS while working with this client even though the Department of Labor had informed her that her employer was required to furnish such training. The Universal Blood and Body Fluid Precautions, an AIDS training seminar on 11 September 1987, and a communicable disease workshop on 11 October 1988 had not provided sufficient instruction for someone with petitioner's disability.

At this point, petitioner determined to file a grievance against DSB, under N.C. Gen. Stat. § 126-34, which provides that "[a]ny career State employee having a grievance arising out of . . . his employment . . . shall . . . follow the grievance procedure established by his department or agency." N.C. Gen. Stat. § 126-34 (1993). The DHR grievance procedure follows the three-step process suggested in the State Personnel Manual. Step 1 involves a review between the employee and her immediate supervisor. Step 2 is an appeal to the unit director. Grievances related to a dismissal shall be filed initially at step 2. Step 3 is an appeal to the Secretary of DHR.

On 1 September 1989 petitioner filed a step 2 grievance appeal contesting the written warning she had earlier received from Ms. Davis. In her request for relief, petitioner sought an "option of a viable workable personnel policy by DSB to protect the rights of employees as well as clients" and an "effective training program for employees who must provide services to individuals with contagious, infectious, communicable diseases." Petitioner's grievance was denied on 7 September 1989 on the ground that no formal disciplinary action had been taken against petitioner.

Mr. Vick, Ms. Davis, Ms. Thompson, and Mr. Hinson met with petitioner on 8 September 1989. Mr. Vick read to petitioner a letter immediately dismissing petitioner from employment for insubordination arising from her continued refusal to provide services to the AIDS client. Petitioner filed an Occupational Safety and Health Act complaint with the North Carolina Department of Labor on 11 September 1989, alleging that her termination was discrimination under

§ 95-130(8) of the North Carolina Occupational Safety and Health Act. The Department of Labor found that DSB policies and training were not adequate for a personal care provider; however, petitioner's claim was dismissed as being premature because she had not been forced to actually engage in hands-on service to the client. Petitioner filed another step 2 grievance appeal, this time challenging her dismissal, on 21 September 1989. The appeal was denied by Mr. Herman Gruber, Director of DSB, on 6 October 1989.

Petitioner initiated a step 3 grievance appeal with DHR on 19 October 1989. David T. Flaherty, Secretary of DHR, notified petitioner on 15 December 1989 that he was denying the grievance and upholding the dismissal. Petitioner then filed a Petition for Administrative Hearing with the Office of Administrative Hearings and the State Personnel Commission (SPC). Administrative Law Judge Beecher R. Gray conducted a hearing on 6 and 7 September 1990 and entered a decision on 21 February 1991 recommending that petitioner be reinstated. Judge Gray concluded that petitioner's termination was without just cause and that DSB violated N.C. Gen. Stat. § 168A-5(5) by failing to make a reasonable accommodation for petitioner's handicapping condition.

Contrary to the recommended decision, the full SPC issued a decision and order on 23 October 1991 upholding petitioner's dismissal as being for just cause and not discriminatory on the basis of her handicapping condition. Petitioner filed a Petition for Judicial Review on 22 November 1991. Superior Court Judge Narley L. Cashwell remanded the case to the SPC on 15 June 1992 on grounds that: (1) the SPC did not hear new evidence after receiving the ALJ's Recommended Decision; (2) the SPC's decision and order failed to state specific reasons for declining to adopt certain findings of fact made by the ALJ; and (3) the conclusions of law in the SPC's decision and order were not conclusions of law and were erroneous. After remand, the SPC again ordered on 18 February 1993 for the dismissal to be upheld.

Petitioner filed another Petition for Judicial Review on 11 March 1993, alleging: (1) that although the SPC refused to adopt the ALJ's Recommended Decision, it violated N.C. Gen. Stat. § 150B-51(a) by not providing specific reasons for its refusal to adopt the decision; (2) the SPC's decision was not supported by substantial evidence; (3) the SPC's decision was affected by error of law; (4) the SPC's decision was made upon unlawful procedure; and (5) the decision violated due

process and was arbitrary and capricious. Superior Court Judge Donald W. Stephens held a hearing on these matters on 8 October 1993. Judge Stephens signed an order on 9 November 1993 reversing the decision of the SPC. The court found that the evidence failed to show that DSB's request was reasonable and that petitioner's refusal to comply with her supervisor's request was willful. According to Judge Stephens, the evidence of record was insufficient to support a finding and conclusion of insubordination or just cause for the termination of petitioner. The order entitled petitioner to reinstatement, reimbursement for lost wages and benefits, and reimbursement for reasonable attorney fees and costs to be set by a separate order. DHR appeals from this order. Upon a review of the entire record, we affirm the order of the superior court reinstating petitioner.

The reviewing court may reverse or modify an agency's decision if the substantial rights of the petitioner may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are unsupported by substantial evidence in view of the entire record as submitted. N.C. Gen. Stat. § 150B-51(b)(5) (1991). This standard, the "whole record" test, does not allow the reviewing court to replace the agency's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*. *Crump v. Board of Education*, 79 N.C. App. 372, 374, 339 S.E.2d 483, 484, *disc. review denied*, 317 N.C. 333, 346 S.E.2d 137 (1986). Only when there is no substantial evidence supporting administrative action should the court reverse an agency's ruling. Substantial evidence is that which a reasonable mind would regard as adequately supporting a particular conclusion. *Walker v. N.C. Dept. of Human Resources*, 100 N.C. App. 498, 397 S.E.2d 350 (1990), *disc. review denied*, 328 N.C. 98, 402 S.E.2d 430 (1991).

When an appellate court reviews the decision of a lower court (as opposed to reviewing an administrative agency's decision on direct appeal), the scope of review is the same as for other civil cases. *Henderson v. North Carolina Dept. of Human Resources*, 91 N.C. App. 527, 531, 372 S.E.2d 887, 890 (1988). However, this review also requires an examination of the entire record. *Id.* A review of the entire record in the present case reveals that the superior court did not err in ruling that there is not substantial evidence to support the termination of petitioner's employment on the basis of insubordination.

MENDENHALL v. N.C. DEPT. OF HUMAN RESOURCES

[119 N.C. App. 644 (1995)]

The State Employee's Handbook defines insubordination as the refusal to accept a reasonable and proper assignment from an authorized supervisor. *Urback v. East Carolina University*, 105 N.C. App. 605, 608, 414 S.E.2d 100, 102, *disc. review denied*, 331 N.C. 291, 417 S.E.2d 70 (1992). The reasonableness of the assignment must be determined in light of the relative circumstances existing at the time of the incident. *Employment Sec. Commission of North Carolina v. Lachman*, 305 N.C. 492, 506, 290 S.E.2d 616, 624-25 (1982). Insubordination also requires a determination that the refusal was willful. *Urback*, 105 N.C. App. at 608, 414 S.E.2d at 102.

The Supreme Court held in *Lachman* that outside considerations such as "broken equipment, ill health, unavailability of necessary materials, etc." are factors in determining whether the assignment was reasonable. *Lachman*, 305 N.C. at 506, 290 S.E.2d at 625. Likewise, in the present case, it is proper to consider factors such as the risk to petitioner in providing services to the AIDS client and petitioner's lack of training in precautions to take with an AIDS patient when determining whether the DSB assignment was reasonable.

There were numerous findings of fact in the SPC's decision and order stating possible risks that petitioner faced in servicing this particular client. Other findings revealed petitioner's lack of proper training. Among the findings of the ALJ adopted by the SPC that tend to show the assignment was not reasonable are: (1) "blindness occurs in the late, most contagious stages of AIDS;" (2) "the skills requested by the client involved the use of sharp objects, and therefore there was a risk that either petitioner or the client could be cut during the provision of services"; and (3) neither of the two DSB sessions relating to AIDS "presented information or demonstrations designed to inform sighted or blind personal care providers such as social workers of precautionary measures to be taken while working with AIDS clients." After adopting these findings of fact, the SPC cannot justify a finding that the DSB request was reasonable. Instead, the SPC should have also adopted the ALJ's conclusion that the request was not reasonable and that there were no grounds for insubordination.

Respondent argues that the request was reasonable because it only required the initial interview and no actual contact with the client. However, the manner in which the DSB officials posed the request to petitioner made it appear that her only choice was to conduct the assessment *and* begin teaching skills to the client. Mr. Vick specifically ordered petitioner not only to complete the assessment and service plan, but also to initiate services. Petitioner's reasonable

perception was that in order to satisfy this directive she would have to put her health at risk. Any reasonable person would have thought that the DSB directive included the initiation of full services, due to the language used by petitioner's superiors. Based on the risks involved to a blind social worker conducting hands-on training with sharp objects and a blind AIDS patient, the request was unreasonable.

Petitioner's refusal to service the client did not meet the second requirement for insubordination because it was not willful. The SPC should have considered petitioner's concerns and concluded that her refusal to act was not willful. In *Urback*, an air conditioning techni-cian was terminated by East Carolina University when he refused to remove asbestos from a building. The SPC found Urback's fears to be "legitimate, genuine, and reasonable," but still upheld his termination. *Urback*, 105 N.C. App. at 608, 414 S.E.2d at 102. Even though the Department of Labor later found the assignment not to be dangerous, we ruled that the SPC erred in its view that Urback's perception of the safety of the job assignment was irrelevant. *Id.* The conduct of an employee cannot be labeled willful misconduct if it is determined that the employee's actions were reasonable and taken with good cause. *Id.* A ruling that despite the reasonableness of an employee's fears, their refusal to act nevertheless amounted to insubordination is clearly erroneous as a matter of law. *Id.*

The present case is similar to *Urback* in that conducting the ini-tial assessment would not have been a dangerous assignment and not placed petitioner at risk. However, petitioner reasonably perceived that she was being required to provide full services to the client and that her health would be in jeopardy if she completed the request. Petitioner's fear of the risks involved in servicing a client with AIDS is documented by her oral and written communication with her supe-riors. Before taking any other action, petitioner requested a copy of the DSB policy for AIDS clients. After not receiving the policy, she informed Ms. Davis that she had reservations about working with an AIDS client. Petitioner relayed these same fears to Mr. Vick. Petitioner also protested her lack of training in the safeguards and precautions to follow when working with AIDS patients, but received no instruction in this area from DSB. Petitioner finally filed a griev-ance protesting the lack of a DSB policy and the health risk posed to her by servicing the client.

Petitioner's fears were not solely based on her personal beliefs about AIDS. She spent a considerable amount of time educating her-

self on the disease. Petitioner traveled to the Regional Library for the Blind in Raleigh, researched AIDS, and discovered that AIDS patients such as the client were in the most contagious stage of the disease. She also contacted the North Carolina Department of Labor regarding her concerns. A representative advised her that it would be hazardous for her to give hands-on training to a blind person with AIDS. Petitioner was also assured that she would not lose her job for refusing to service the client. Petitioner's efforts to educate herself on AIDS reveal that her fears were legitimate, genuine, and reasonable, much like the employee in *Urback*. Her superiors even recognized that petitioner's "concerns [were] understandable." As in *Urback*, it is erroneous as a matter of law to find that petitioner's refusal to act was willful and amounted to insubordination.

Petitioner never initiated services because she did not know how to approach the client. She could not turn to the resource specialists because one was pregnant and the other was not qualified to teach the independent living skills requested by the client. Further, the contract instructors provided only limited services and one of them, due to his own blindness, was in no better position than petitioner to work with the client. Petitioner was willing to service the client as long as she received assurance from DSB that a sighted employee would perform the hands-on training. Without this assurance, petitioner's refusal to provide services cannot be termed willful and therefore was not insubordination. Her actions were reasonable under the circumstances, taken with good cause, and satisfied the standard set forth in *Urback*.

The decision of the trial court is affirmed because the DSB request was not reasonable and petitioner's actions were not willful. Accordingly, there were not sufficient grounds to dismiss petitioner on the basis of insubordination. The case is remanded to Wake County Superior Court for the entry of further orders for reimbursement for reasonable attorney fees and costs.

Affirmed and remanded for entry of further orders.

Chief Judge ARNOLD and Judge LEWIS concur.