BETTY J. SOUTHER, Petitioner v. NEW RIVER AREA MENTAL HEALTH DEVELOP-
MENT DISABILITIES AND SUBSTANCE ABUSE PROGRAM, Respondent

No. COA99-1092

(Filed 6 February 2001)

**Public Officers and Employees— termination—insubordina-
tion—evidence insufficient**

The trial court correctly reversed a decision of the State
Personnel Commission, which had upheld the termination of
petitioner's employment, where petitioner had worked as an
habilitation assistant providing care in the home of a severely
disabled client; petitioner complained of sexual harassment by
the father of the client; respondent allowed petitioner to take
vacation time and to care for the client in petitioner's own home
while undertaking an investigation; respondent concluded that
petitioner's allegations were without merit and asked petitioner
to resume caring for the client in the client's home; and peti-
tioner's employment was terminated when she refused.
Petitioner had the burden of proving that her termination was
not for just cause; respondent contended that petitioner was dis-
missed for insubordination following her failure to attend a
meeting with her supervisors and her refusal to provide service
to her client. Based upon a de novo review of the proceeding, the
refusal to attend the meeting did not constitute insubordination
because she had a reasonable understanding from State
Personnel Guidelines that she was entitled to an initial meeting
with only her immediate supervisor rather than a joint meeting

with several people, one of whom she perceived to be hostile, when she was not aware that her claims had been investigated and feared that she might lose her job. Furthermore, her refusal to comply with the directive to return to the client's home was reasonable under circumstances in which she was not aware that her complaints had been investigated and was given no alternative to returning to what she considered an unacceptable working environment.

Judge EDMUNDS dissenting prior to 31 December 2000.

Appeal by respondent from order entered 21 May 1999 by Judge L. Todd Burke in Superior Court, Wilkes County. Heard in the Court of Appeals 17 May 2000.

*Legal Services of the Blue Ridge, by Charlotte Gail Blake, for petitioner-appellee.*

*McElwee Firm, PLLC, by Elizabeth K. Mahan and William H. McElwee, III, for respondent-appellant.*

WYNN, Judge.

Respondent New River Area Mental Health appeals from the trial court's order reversing its termination of petitioner Betty J. Souther. We affirm.

New River employed Souther in September 1988 as an habilitation assistant for the Community Alternatives Program For People With Mental Retardation. The Community Alternatives Program allows disabled individuals to avoid institutionalization by receiving care at home. Under the program, habilitation assistants provide personal and respite care to the disabled participants. The assistants typically serve one client at a time.

During Souther's employment with New River, Randy Johnson was her immediate supervisor; Suzanne Tate was the Director of Developmental Disabilities and Johnson's supervisor; and, Dorothy Beamon was the Area Director and supervisor of New River's mental health programs.

In 1988, New River assigned Souther to care for Robinette Jenkins, the daughter of Lester and Virginia Jenkins. Robinette was severely disabled and required constant assistance with personal maintenance. In late June or early July 1993, Souther informed Lester

Jenkins that she was having trouble with her neighbors; so, he allowed her to move her trailer onto his lot. Later in 1993, Souther complained to her immediate supervisor, Johnson, that Mr. Jenkins was sexually harassing her and expressed concerns about working in the Jenkins' home. Upon receiving these complaints, New River allowed Souther to take vacation time and to care for Robinette in her own home; at the same time, New River undertook an investigation of her complaints. New River's investigation concluded that Souther's allegations were without merit. Accordingly, at a meeting on 20 September 1993, Beamon asked Souther to resume assisting Robinette in the Jenkins' home. Souther, however, refused. Thereafter, New River terminated her employment.

Souther appealed to the Office of Administrative Hearings. After conducting an evidentiary hearing, the assigned Administrative Law Judge entered a Recommended Decision to affirm the dismissal for just cause. Souther appealed to the State Personnel Commission, which conducted a whole record review and adopted the recommended findings and conclusions of the Administrative Law Judge and recommended that New River "find and conclude that it had just cause to terminate Souther for her unacceptable personal conduct due to her refusal to obey a reasonable work [order]." Thereafter, Souther brought a Petition for Judicial Review before the Superior Court in Wilkes County. The trial court granted the petition and, "after hearing the arguments of counsel and reviewing the official record, including the transcript of the administrative hearing, and the memoranda submitted by counsel," found that New River's decision to terminate Souther was "arbitrary and capricious and not supported by substantial evidence in light of the whole record." From the trial court's order reversing Souther's termination, New River appeals.

Our review of a superior court order regarding an agency decision consists of: " '(1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly.' " *ACT-UP Triangle v. Commission for Health Services*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997) (quoting *Amanini v. N.C. Dep't of Human Resources*, 114 N.C. App. 668, 675, 443 S.E.2d 114, 118-19 (1994)).

The proper standard for the superior court to apply depends upon the issues presented on appeal. Where the petitioner alleges that the agency decision was either unsupported by the evidence, or arbitrary and capricious, the superior court applies the "whole

record test" to determine whether the agency decision was sup-
ported by substantial evidence contained in the entire record.
Where the petitioner alleges that the agency decision was based
on error of law, the reviewing court must examine the record *de
novo*, as though the issue had not yet been considered by the
agency.

*Avant v. Sandhills Center for Mental Health*, 132 N.C. App. 542, 546,
513 S.E.2d 79, 82 (1999) (internal citations omitted).

Both parties contend the superior court, in reviewing the
Administrative Law Judge's decision, appropriately employed the
"whole record" standard. However, this Court has held that a superior
court's determination of whether a termination was for "just cause"
based upon personal misconduct is a question of law, and that ques-
tions of law are to be reviewed *de novo*. *See Amanini*, 114 N.C. App.
at 677, 678, 443 S.E.2d at 119, 120. A *de novo* review "requires a court
to consider a question anew, as if not considered or decided by the
agency." *Id.* at 674, 443 S.E.2d at 118.

We note that the *Amanini* court observed that "[s]eparate panels
of this Court [] appear to have reached differing conclusions con-
cerning the proper standard of appellate review" of orders of the
superior court affirming or reversing a decision of an administrative
agency. *Id.* at 675, 443 S.E.2d at 118. After an extended review and dis-
cussion of the issue, the *Amanini* court held that the proper standard
of review is whether the superior court applied the proper scope of
review and did so properly. *Id.* at 675-76, 443 S.E.2d at 118-19. Despite
some continuing inconsistencies within the court, *see Mendenhall v.
N.C. Dep't of Hum. Res.*, 119 N.C. App. 644, 650, 459 S.E.2d 820, 824
(1995) (citation omitted) ("When an appellate court reviews the deci-
sion of a lower court (as opposed to reviewing an administrative
agency's decision on direct appeal), the scope of review is the same
as for other civil cases. However, this review also requires an ex-
amination of the entire record."), we believe that the analysis in
*Amanini* is persuasive. We will employ the proper standard of review
regardless of that employed by the reviewing trial court. *See
Amanini*, 114 N.C. App. at 675, 677, 443 S.E.2d at 118, 119 ("[T]he
manner of our review is [not] governed merely by the label an appel-
lant places upon an assignment of error; rather, we first determine
the actual nature of the contended error, then proceed with an ap-
plication of the proper scope of review. [] [W]here the initial review-
ing court should have conducted *de novo* review, this Court will

directly review the State Personnel Commission's decision under a *de novo* review standard.")

A state employee may be dismissed only for "just cause." N.C. Gen. Stat. § 126-35 (1995). An employee challenging his or her termination for just cause has the burden of proving that the agency's decision was improper. As our Supreme Court has said:

> [A]n employee terminated pursuant to the "just cause" provision of N.C.G.S. § 126-35 should bear the burden of proof in an action contesting the validity of that termination. Petitioner, the terminated employee, is the party attempting to alter the *status quo*. The burden should appropriately rest upon the employee who brings the action, even if the proof of that position requires the demonstration of the absence of certain events or causes. Neither party in a "just cause" termination dispute has peculiar knowledge not available to the opposing party. A terminated employee may readily utilize the procedures outlined in chapter 126 and section 1A-1 of the North Carolina General Statutes, as well as title 26 of the North Carolina Administrative Code, to obtain any and all necessary information to establish and advocate his or her position.

*Peace v. Employment Sec. Comm'n of North Carolina*, 349 N.C. 315, 328, 507 S.E.2d 272, 281-82 (1998). Just cause may result either from unacceptable job performance or unacceptable personal conduct. *See Amanini* at 679, 443 S.E.2d at 120. The difference is important because an employee must receive certain warnings before being terminated for unsatisfactory job performance, while no warnings are required for termination based on personal misconduct. *See id.* at 679, 443 S.E.2d at 121. However, "[t]he categories are not mutually exclusive, as certain actions by employees may fall into both categories, depending upon the facts of each case." N.C. Admin. Code tit. 25, r. 1J.0604 (June 2000).

Although New River never specifically stated the grounds for Souther's dismissal, Beamon's letter terminating petitioner read in pertinent part:

> Over the past weeks, your relationship with your client's family has deteriorated to the point that you refuse to provide in-home services to your client in her home. As you have been aware, the main purpose of the work you do for us is to enable clients to live in their own homes.

You refused to meet with me and your supervisor on 9-15-93, after being required by your supervisor to do so for the purpose of getting services flowing to your client again. Recently, you have spent a great deal of time and energy discussing with various staff how stressful it is for you to work here.

Thus, New River's finding of just cause was based on (1) petitioner's refusal to provide service to her client, and (2) petitioner's failure to attend the 15 September 1993 meeting with her supervisors.

New River contends that these reasons for dismissal constitute insubordination. "Insubordination" is defined as "the refusal to accept a reasonable and proper assignment from an authorized supervisor." *Mendenhall*, 119 N.C. App. at 651, 459 S.E.2d at 824 (citation omitted). Insubordination has been defined more broadly as "1. A willful disregard of an employer's instructions . . . . 2. An act of disobedience to proper authority; esp. a refusal to obey an order that a superior officer is authorized to give." *Black's Law Dictionary* 802 (7th ed. 1999). Thus, insubordination involves two elements: (1) A reasonable and proper instruction or assignment by an authorized supervisor; and (2) A willful or intentional refusal to comply with such instruction or assignment. We must therefore determine the reasonableness of the requests made by New River for Souther to return to the Jenkins' home and to attend the 15 September 1993 meeting, and the reasonableness of Souther's failure to comply with those requests. We note that, because insubordination is a form of personal misconduct, *see Amanini*, 114 N.C. App. at 679, 334 S.E.2d at 121, if Souther's conduct constituted insubordination, then New River was not required to provide warnings to her before her discharge.

We first consider the 15 September 1993 meeting, which was called for the purpose of reviewing the results of the investigation into petitioner's allegations and to re-establish service to Robinette. We assume *arguendo* that the request by Beamon and Johnson that Souther attend the meeting was reasonable and proper. Our inquiry thus proceeds to whether Souther's refusal to comply with this reasonable request was willful.

"The conduct of an employee cannot be termed willful misconduct if it is determined that the employee's actions were reasonable and taken with good cause." *Urback v. East Carolina Univ.*, 105 N.C. App. 605, 608, 414 S.E.2d 100, 102, *disc. review denied*, 331 N.C. 291, 417 S.E.2d 70 (1992). What constitutes a "reasonable" action by petitioner is necessarily a subjective determination. *See, e.g., Mendenhall*

(holding that under whole record test, a petitioner was improperly terminated for insubordination where petitioner refused to care for AIDS patient on the basis of legitimate and reasonable health concerns). Therefore, we will review the record in some detail to determine the reasonableness of Souther's actions.

The record shows that on 14 September 1993, Johnson and Beamon met with Tate to discuss Souther's allegations and the results of Johnson's abbreviated investigation into those allegations. At that meeting, Beamon, the Area Director, decided on the basis of Johnson's investigation and report that Lester Jenkins had not sexually harassed Souther and that Souther's allegations were unfounded. Following the 14 September 1993 meeting, Beamon called Souther to arrange for a meeting with Beamon and Johnson.

According to Souther's account of this telephone call from Beamon on 14 September 1993, Beamon was very angry with Souther and spoke rudely to her. Beamon informed Souther during this call that she did not believe Souther's account of the events concerning Lester Jenkins. Souther testified that she was worried about meeting with Beamon and Johnson together on 15 September. Furthermore, she understood from her copy of the State Employees' Grievance Policy that she first was entitled to a meeting alone with her immediate supervisor, Johnson, rather than a joint meeting with both Johnson and Beamon.

On 15 September 1993, Souther sent a letter to Johnson asking for his help in resolving her complaint. When Souther failed to show up for the 15 September meeting, Beamon called Souther again. According to Beamon's notes from this conversation, Souther repeatedly expressed her reservations about meeting with the supervisors without an attorney present, and indicated that she could not meet with the supervisors without an attorney.

The North Carolina Administrative Code, as it existed in 1993, provided that "[p]rior to dismissal of a permanent employee on the basis of personal conduct, there shall be a pre-dismissal conference between the employee and the person recommending dismissal. This conference shall be held in accordance with the provision of 25 NCAC 1J .0606(2), (3)." 25 NCAC 1J .0608(c) (effective 1 July 1989). The requirements for the pre-dismissal conference provided in part that "[t]he Supervisor or designated management representative shall schedule and conduct a pre-dismissal conference with the employee. Advance notice of the pre-dismissal conference must be given to the

employee. A second management representative or security person-nel may be present at management's discretion." 25 NCAC 1J .0606(2) (effective 1 September 1991).

Following the hearing of this matter, an Administrative Law Judge issued a recommended decision which included findings of fact and conclusions of law. In her conclusions of law, the Administrative Law Judge found that "[t]he presence of more than one management per-son at the [20 September 1993] conference was a violation of [State Personnel Commission] rules regarding who is to attend pre-dismissal conferences." Nonetheless, the Administrative Law Judge found that, because Souther was permitted to have her attorney present at the 20 September meeting, "she was not unduly prejudiced by this procedural violation."

Souther's understanding that she was entitled, pursuant to these State Personnel Commission guidelines, to an initial meeting with only Johnson was not inherently unreasonable. Furthermore, Souther was worried by what she perceived to be a hostile attitude on behalf of Beamon, and feared that she might lose her job. It is apparent from the record that Souther perceived that Beamon and Johnson did not believe her allegations, and Souther was not aware that her claims had been investigated at all. Moreover, the record supports Souther's contention that she understood from Beamon's telephone call on 14 September 1993 that Beamon, Tate and Johnson (who were all present at the 14 September discussion) would all be present at the proposed 15 September meeting, which would have been a clear vio-lation of the requirements for the pre-dismissal conference (as was the presence of all three at the 20 September meeting). These facts indicate the basis of Souther's failure to attend the 15 September 1993 meeting, which failure appears under the circumstances to have been reasonable. Thus, Souther's refusal to attend the meeting did not con-stitute insubordination.

We must next determine whether Souther's refusal at the 20 September 1993 meeting to re-establish in-house care for Robinette amounted to insubordination. A careful review of the record on appeal reveals the reasonableness of this action as well.

The investigation which was performed by New River into Souther's allegations of sexual harassment by Lester Jenkins appears to have been limited at best. Souther testified that she initially believed that Lester Jenkins' comments that she should get out and date, and asking for sex with her, were "one big joke." However, he

persisted, and she testified that when Lester Jenkins forthrightly stated without euphemisms that he wanted to have sex with her, she knew his comments had not been a joke. According to petitioner, she notified Johnson and asked him to talk to Lester Jenkins. She wanted Johnson to "tell [Lester Jenkins] that this was bothering [her], and . . . to leave that kind of jokes alone because . . . they weren't appropriate for the work."

On 17 August 1993, Souther first contacted Johnson regarding her concerns, reporting, according to Johnson's notes from the conversation, that Lester Jenkins "had said or done something which caused [Souther] emotional pain and hurt." Souther also expressed her desire to tell Johnson the details regarding the incident but was hesitant to do so as she did not feel she would be believed. At this point Johnson took no action, though he was clearly aware that something had occurred between Souther and Lester Jenkins which was causing Souther some distress.

On 19 August 1993, Souther again spoke with Johnson; and, according to Johnson's notes, she informed Johnson that "Jenkins offered to help her complete moving into her new trailer if she would repay him with sexual favors." According to Souther's testimony before the Administrative Law Judge, she informed Johnson that Lester Jenkins' comments were bothering her, and asked Johnson to talk to Lester Jenkins alone as she did not want the situation to hurt his wife, with whom Souther had become very close over the years during which she had cared for Robinette. Johnson informed both Tate and Beamon of Souther's allegations for the first time on 19 August 1993.

Later that same day, Johnson visited with Mrs. Jenkins at the Jenkins' residence and, contrary to Souther's wishes, discussed Souther's allegations with her. Mrs. Jenkins informed Johnson that there had been some noticeable tension between Souther and her husband, and that her husband had apparently remarked to Souther that, "Today, I'll help you move your bed into your new trailer. I don't think anyone will say anything about us being in the bedroom at the same time."

After meeting with Mrs. Jenkins, Johnson met with Souther at her home. At that time, Souther informed Johnson in more detail concerning the comments made to her by Lester Jenkins. They also agreed that Souther should take some leave time until 30 August, to coincide with Johnson's vacation. Johnson was out of town on vaca-

tion from 20 August until 30 August 1993. During this time, neither Johnson nor Tate nor Beamon made any further attempts to investigate Souther's allegations. Tate testified that she was in Colorado attending training sessions from approximately 25 August until 13 September 1993. Beamon testified that she had no contact with Johnson regarding the matter between 19 August and approximately 14 September 1993.

After Johnson returned from vacation on 30 August 1993, Souther called Johnson to inform him that she still had some reservations about caring for Robinette in the Jenkins' home, and they arranged for Souther to temporarily care for Robinette in Souther's home. The record shows that Souther's reservations at this point were reasonable, as no further investigation had been performed beyond Johnson's limited interview of Mrs. Jenkins on 19 August. Furthermore, Souther was unaware that any investigation whatsoever had been performed. Johnson testified before the Administrative Law Judge that he agreed that it was reasonable for Souther to still have concerns about returning to work on 30 August 1993 as no work had been done on investigating her complaint at that time.

On 31 August 1993, Johnson spoke with Souther on the telephone and again met with her in person to discuss her allegations in more detail. Johnson did not investigate the matter further until 13 September 1993, when he met with the Jenkins' and their son, Ray Jenkins, at the Jenkins' residence. At this meeting, Johnson learned that Lester Jenkins had indeed made comments of a sexual nature to Souther, comments which Lester Jenkins considered to have been made in a joking manner. Johnson also learned that Mrs. Jenkins believed that Souther actually thought Lester Jenkins was asking to have sex with Souther. Johnson himself testified that he could understand how Lester Jenkins' comments could have been interpreted by Souther to mean that he wanted to have sex with her. No further action was taken until Johnson's meeting with Tate and Beamon on 14 September.

From the evidence in the record, it appears that neither Johnson nor anyone else from New River ever met with Lester Jenkins alone to discuss Souther's allegations. Johnson acknowledged that he considered the possibility that Lester Jenkins might be less candid discussing the allegations in the presence of his wife. Furthermore, Souther had asked that Johnson's inquiry be "low-key," and asked that Johnson not involve Mrs. Jenkins. Nonetheless, Johnson first dis-

cussed Souther's allegations with Mrs. Jenkins alone on 19 August, and later on 13 September with the Jenkins' and their son. These were the only instances in which Johnson met with the Jenkins'. Johnson testified that he asked Souther to meet with him together with the Jenkins', a request with which Souther refused to comply. Johnson admitted, however, that he did not think it unusual that Souther might be hesitant to discuss her allegations person to person with Lester Jenkins, particularly in front of Mrs. Jenkins.

Johnson also testified that he never told or asked Lester Jenkins to refrain from making any further jokes to Souther involving sexual connotations or innuendo. Johnson stated that he did not inform Souther until 20 September 1993, at the pre-dismissal conference immediately following which Souther was dismissed, that he had talked with the Jenkins' concerning Souther's allegations. According to Souther, she was *never* informed by anyone at New River that her complaints had been investigated, and was instead only informed that her allegations were deemed unfounded and she was not believed.

In the hearing before the Administrative Law Judge, when asked whether she felt that her complaint had been properly investigated, Souther responded, "to this day, if they've investigated it, I don't know it." No one ever conveyed to Souther that Lester Jenkins, in the 13 September 1993 meeting with Johnson, had offered to apologize to Souther. Souther testified that if she had been informed of the investigation and of Lester Jenkins' offer to apologize, she would have returned to work as requested. There was also testimony that Johnson suggested to Souther the option of working with another family instead of the Jenkins. However, when Souther requested that this option be pursued, Johnson informed her that no other families were available.

At the 20 September 1993 meeting, Souther was given the ultimatum of either returning to the Jenkins' home to provide in-house care for Robinette or losing her job. *See* N.C. Gen. Stat. § 143-422.2 (1996) and Section 703(a)(1) of Title VII (as amended, 42 U.S.C.A. § 2000e-2(a)(1) (1994)). *See* 29 C.F.R. § 1604.11(a) (1999) ("Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, . . . or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating,

hostile, or offensive working environment.") Souther testified that she did not feel safe in the Jenkins' home. Under these circumstances, unaware that her complaints had been investigated and given no alternative to returning to what she considered to be an unacceptable working environment, Souther's refusal to comply with New River's directive to return to the Jenkins' home was reasonable.

As noted above, petitioner has the burden of proving that her termination was not for "just cause." Based on all of the testimony and following a *de novo* review of the proceedings, we believe that Souther's refusal to attend the 15 September 1993 meeting and to return to work in the Jenkins' home was reasonable and did not constitute insubordination. As Souther's conduct did not amount to insubordination, New River lacked just cause to fire her. The order entered by the trial court, reversing the decision of the Commission, is therefore,

Affirmed.

Judge MARTIN concurs.

Judge EDMUNDS dissents in a separate opinion written prior to 31 December 2000.

EDMUNDS, Judge, dissenting.

Because I believe petitioner failed to meet her burden of proving that respondent's decision was improper, *see Peace v. Employment Sec. Comm'n*, 349 N.C. 315, 328, 507 S.E.2d 272, 281 (1998), I respectfully dissent.

The majority correctly points out that petitioner's dismissal was based upon her insubordination in failing to attend the 15 September 1993 meeting with her supervisors and in refusing to re-establish services to her client. Accordingly, in conducting a *de novo* review of this case, *see Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 678, 443 S.E.2d 114, 118 (1994), this Court must review the entire record, *see id.*, to determine whether petitioner has proven *either* (1) that the instructions given by her supervisors were improper or unreasonable *or* (2) that her refusal to comply with the instructions was neither willful nor intentional, *see Mendenhall v. N.C. Dept. of Human Resources*, 119 N.C. App. 644, 651, 459 S.E.2d 820, 824 (1995). If petitioner fails to meet her burden for either of

SOUTHER v. NEW RIVER AREA MENTAL HEALTH

[142 N.C. App. 1 (2001)]

the reasons given for her termination, respondent's decision should stand.

### The 15 September 1993 Meeting

On 13 September 1993, Randy Johnson (Johnson), petitioner's immediate supervisor, met with Mr. and Mrs. Jenkins to discuss their relationship with petitioner. Mr. Jenkins acknowledged making some of the remarks of which petitioner had complained, but stated that he was joking and that he thought he and petitioner were good enough friends that he could banter with her. After this meeting, Johnson spoke with Suzanne Tate (Tate), his supervisor, and they decided to meet with petitioner in an attempt to resolve the situation. Accordingly, on 14 September 1993, Dorothy Beamon (Beamon), Area Director and supervisor of New River's health programs, telephoned petitioner to set up a meeting for the next day. Johnson was present when Beamon made the call, and he understood that petitioner would attend the meeting. However, petitioner did not show up on 15 September 1993; when Beamon called petitioner after waiting for her for thirty minutes, petitioner refused to attend.

At the hearing, when asked about the 15 September meeting, petitioner stated that Beamon called her on the fifteenth and sounded "angry and upset." Beamon "made [a] statement about the meeting, and I told her I didn't know anything about a meeting." On cross-examination, she likewise stated that although she did remember Beamon calling her, she did not recall being asked to attend a meeting on the fifteenth. When asked why petitioner attended the 20 September meeting but not the 15 September meeting, petitioner couldn't "recall."

However, under continued questioning, petitioner finally admitted that she knew that the meeting had been scheduled and had decided not to attend: "I knew that if I went, it was going to be one person, me, against the three of them, and I was scared." The following colloquy then occurred:

Q. All right, Ms. Souther, it is true then that you were asked to be at a meeting by your employer on September the 15th and that you did not attend that meeting?

A. Yes, sir.

. . . .

A. I was given a copy when hired of the State Employee's Grievance Policy. According to that, my first meeting will be with my immediate supervisor. When she called, she was angry, and I asked her to talk to Randy on what it was about. She was very, very, very angry at me.

. . . .

Q. Okay. So, your reason for ignoring your employer's request that you attend a meeting on the 15th day of September was because she was angry when she called you—

A. Yes, sir.

Q. —and asked you to come?

A. Yes, sir.

On redirect examination, petitioner testified further:

Q. Why did you not go to [the 15 September] meeting?

A. Because when Ms. Beamon called me about the September 15th meeting, she was very unpleasant. She was rude. She was very angry. I asked her to talk to Randy so she would understand what had happened, and she said Randy was with her in her office and that she did not believe anything and wanted me to meet with all three. I felt like—at that point, I was scared of losing my job when I heard her anger. I didn't think that I could handle all three of them. I knew if I met with them—whatever took place in the meeting, the three of them would agree on what was said and on what was not. I asked [an attorney] to go with me simply to hear what took place.

Additionally, as part of her case, petitioner offered into evidence her handwritten position letter to the Equal Employment Opportunity Commission, in which she stated,

The first response from Mr. Randy Johnson in regards to my being sexually harassed was a phone call telling me to come to a meeting with him, Randy Johnson the case manager, Ms. Suzanne Tate the CAP/MR/DD Coordinator and Ms. Dorothy R. Beamon the Area Director of New River Mental Health Center. At this point I felt my job might be in jeopardy and asked if I could have a lawyer present. I was told no. I asked Mr. Johnson if I could meet with just him, Mr. Randy Johnson and Ms. Suzanne Tate. I was told no. I did not attend the meeting because I was very con-

SOUTHER v. NEW RIVER AREA MENTAL HEALTH

[142 N.C. App. 1 (2001)]

cerned, upset, worried, scared and felt I could not deal with the three of them, alone.

Petitioner then rested her case.

The foregoing recitation constitutes the whole of petitioner's evidence regarding the meeting. She presented no evidence that respondent's request to meet was in any way improper or unreasonable. Moreover, the only reasons given for petitioner's refusal to attend was that Beamon was angry and rude and that petitioner was "scared." The majority finds that petitioner acted reasonably because she understood that more than one management person would be present at the meeting and because she perceived that management did not believe her allegations. I cannot agree. Although there was evidence contradicting petitioner's contentions that Beamon displayed anger or rudeness toward petitioner, and although petitioner's credibility was tattered at the end of her examination, even giving petitioner the benefit of the doubt and assuming that Beamon was overtly angry, petitioner was the employee in an employment relationship. Her fear and perception regarding the attitudes or beliefs of supervisors are insufficient to establish that her refusal to attend a proper meeting was reasonable. Accordingly, I would reverse the decision of the trial court based upon petitioner's willful and intentional refusal to attend the 15 September 1993 meeting.

### Request to Resume Services to Robinette

I also believe petitioner failed to satisfy her burden with regard to respondent's request to re-establish care to Robinette and her family. Again, petitioner was required to carry the burden of establishing that respondent's request was unreasonable or that her refusal to comply was justified or unintentional. See Mendenhall, 119 N.C. App. at 651, 459 S.E.2d at 824.

Petitioner claimed that Mr. Jenkins sexually harassed her and that she was neither advised of respondent's investigation of her complaints nor that anyone had spoken with Mr. Jenkins about her allegations. However, petitioner's credibility was an issue in resolving these disputed matters. She claimed that if she had been advised that an investigation had taken place and that a representative of respondent had spoken with Mr. Jenkins, she would have returned to work in the Jenkins home. She testified at the hearing that at the 20 September 1993 meeting attended by her, her attorney, Beamon, Tate, and Johnson, Beamon called petitioner a "liar," that Beamon "knew

[Mr. and Mrs. Jenkins] longer than [petitioner] had, [and] that [Beamon] did not believe [petitioner]," and that Johnson also said he did not believe petitioner's allegations. Petitioner claimed that she was not given a choice between resuming services to the Jenkins family or losing her job.

When cross-examined at the hearing, petitioner was confronted with notes taken by Johnson during meetings with petitioner and maintained in a log of supervision. Petitioner denied practically everything recorded in Johnson's notes:

> Q. All right. I'm going to read you a paragraph. And I want you to tell me whether or not you said this to Randy Johnson. "In a meeting with Betty later that day, August 19, 1993, Betty said she wanted Mr. Jenkins to stop yelling at her. The yelling brought back painful memories. She would ask why he could not go somewhere else to get his needs met." . . .
>
> . . . .
>
> Q. . . . "She explained Mr. Jenkins told her that he would help her move to her new trailer, and she could repay him with sexual favors. According to Betty, he indicated how she could repay him by saying 'You know what I mean.' " Now, I've just read you a paragraph from Mr. Johnson's notes that he will testify that he made on the 19th, and I'm asking you if you agree that that is what you said to him on the 19th? That's not what you said to him?
>
> A. No.

Petitioner denied meeting Johnson again in person on 31 August 1993 and stated she had only met with him once prior to the September meeting. She also denied everything in Johnson's notes of the 31 August meeting:

> Q. I want to read to you a part of what purports to be a note, and I want you to tell me if this is correct or incorrect. You were talking with Randy Johnson. . . . [Johnson] asked her if she, Mr. Jenkins and [he] could meet. Betty responded no. She said she did not feel that she should be there. She explained that she could not handle it. An ambulance would probably have to be called for her. Betty stated that she wanted me to meet with Lester alone and guarantee her safety. She wants (a) Mr. Jenkins to change his behavior. She

clarified that to mean no more comments about sexual relations. (2) [sic] She [wanted] . . . Mr. Jenkins to treat her with respect—no more yelling. And she wanted to work with Robin in her home—Betty's home—until she is in a better emotional state. Now, is that an accurate summation of what was said?

A. No.

Q. So, these notes are wrong too?

A. No. No.

Q. Okay. What's wrong about them?

A. All of it.

Her testimony is in sharp contrast with that provided by respondent's agents. Johnson testified that he met with Mr. Jenkins after petitioner made her complaints and had investigated her allegations, and that at the 20 September 1993 meeting Beamon gave petitioner the option of returning to work at the Jenkins home or termination. Petitioner asked to be terminated. Tate testified that Beamon advised petitioner that Johnson had met with the Jenkins, that she (Beamon) was satisfied that the investigation had been handled properly, and that it was safe for petitioner to return to the Jenkins home. Petitioner refused. Beamon testified that she advised petitioner that her complaints had been investigated, that she believed Mr. Jenkins' statement that his comments were made in jest, and that there had been no sexual harassment. In addition, both Mr. and Mrs. Jenkins testified at the hearing and described their deteriorating relationship with petitioner.

Based upon this and other evidence presented at the hearing, I respectfully disagree with the majority's holding that petitioner has met her burden as to this issue. Looking first to the propriety and reasonableness of respondent's request, it is doubtless that respondent had the authority to request petitioner's return to work at the Jenkins home; therefore, the request was proper. As to the reasonableness of the request, respondent accommodated petitioner by allowing her to take vacation time and care for Robinette in petitioner's own home while undertaking an investigation of the matter. As part of his investigation, Johnson spoke on several occasions with Mr. and Mrs. Jenkins, who candidly discussed two questionable incidents and gave unvarying statements throughout the investigation and during the

hearing. By contrast, petitioner's statements to Johnson during his investigation were inconsistent with her testimony at the hearing. Accordingly, respondent's request that petitioner return to work was made after an adequate investigation and was reasonable.

As to the reasonableness of petitioner's refusal to comply, I do not believe that petitioner's uncorroborated testimony is sufficient to satisfy her burden of proof. Both the Administrative Law Judge (ALJ), who heard this petition and observed the witnesses, and the State Personnel Commission found petitioner's evidence insufficient to alter the *status quo*. *See Peace*, 349 N.C. at 328, 507 S.E.2d at 281. Although petitioner stated that Mr. Jenkins made a number of statements to her asking for sex, Mr. Jenkins provided a plausible explanation for his comments. Petitioner denied ever making the statements to which Johnson testified. Despite petitioner's claims that she was not advised of respondent's investigation of her complaints and that she would have returned to work had she been told, Johnson, Tate, and Beamon all testified that petitioner was advised both of the investigation and its findings and of the conversations the investigators had with Mr. and Mrs. Jenkins. Other evidence of petitioner's erratic behavior as witnessed by the Jenkins and Johnson also was presented. Accordingly, I believe the trial court erred in reversing the recommended decisions of the ALJ and the State Personnel Commission.

For the reasons stated herein, I respectfully dissent.