ZACHARY, Judge.
 

 *197
 
 Shawn Blackburn (petitioner) appeals from the decision of the Administrative Law Judge (ALJ) upholding his termination as a correctional officer employed by the North Carolina Department of Public Safety (DPS or respondent) for grossly inefficient job performance. On appeal, petitioner argues that the ALJ erred by denying his motion
 
 *198
 

 in limine
 
 to exclude certain evidence from the hearing; that some of the ALJ's findings of fact are not supported by the evidence; and that the ALJ erred by concluding that respondent established by a preponderance of the evidence the existence of just cause to terminate petitioner. We are aware that our correctional officers perform a difficult job, and we are sympathetic to the challenges faced by correctional officers in a prison setting. Nonetheless, after careful review of the facts and the relevant law, we conclude that the ALJ did not err and that the decision of the ALJ should be upheld.
 

 I. Background
 

 Petitioner was hired by DPS as a correctional officer in 1999, was promoted through the ranks, and in March 2014 petitioner was a Correctional Captain at DPS's Alexander Correctional Institution ("Alexander"). As a Correctional Captain, petitioner was responsible for interpreting, developing, and following prison procedures, as well as reviewing the work performed by others to ensure its compliance "with the goals and the missions of the ... Department of Public Safety," including DPS's goals of ensuring "the safety of the inmates" and "the humane confinement of inmates." On 8 and 9 March 2014 petitioner was, in addition to being a Correctional Captain, Alexander's "officer in charge" or "OIC." Petitioner testified that
 
 *513
 
 the OIC was the person who was "left in charge of the daily running of the institution and the safety and welfare of the staff and the inmates at that institution."
 

 Petitioner's dismissal arose from the circumstances surrounding the death of Michael Kerr, an inmate housed at Alexander in March 2014. Mr. Kerr had a history of mental illness for which he had received medication. In February 2014 Mr. Kerr was housed "in 'administrative segregation' or, as it is better known, solitary confinement[,]"
 
 Davis v. Ayala,
 
 --- U.S. ----, ----,
 
 135 S.Ct. 2187
 
 , 2208,
 
 192 L.Ed.2d 323
 
 , ---- (2015), initially for mental health observation. At this time Mr. Kerr was "placed on nutraloaf," which petitioner described as "a management meal that is given to inmates for disciplinary reasons to manage their behavior." At first Mr. Kerr was given milk with the nutraloaf, but on 8 March 2014 petitioner ordered that Mr. Kerr no longer receive milk, because Mr. Kerr had used the milk cartons to stop up the toilet in his cell. Pursuant to petitioner's orders, there was a sign on Mr. Kerr's cell reading "Do not give him milk per Captain Blackburn." The sign remained in place until Mr. Kerr's death, and was visible to staff on all shifts.
 

 Alexander's "Medical Emergency Response Plan" defines a "Code Blue" as "a medical emergency ... requiring the immediate assistance of
 
 *199
 
 medical personnel." On 8 March 2014 Sergeant Johnson, a correctional officer at Alexander, called a Code Blue for Mr. Kerr because Mr. Kerr was not responding to correctional staff. When petitioner arrived at Mr. Kerr's cell, medical personnel were present and Mr. Kerr was lying on his bed in leg restraints and metal handcuffs. After medical personnel determined that Mr. Kerr did not require immediate medical treatment, petitioner allowed Mr. Kerr's leg restraints to be removed, but ordered that Mr. Kerr's handcuffs should not be removed until Mr. Kerr walked to the door and asked for their removal.
 

 Mr. Kerr remained in handcuffs from the time that the Code Blue was called until his death on 12 March 2014. Petitioner admitted that after he ordered on 8 March 2014 that Mr. Kerr no longer receive milk, the only way Mr. Kerr could obtain any fluid would be to use his handcuffed hands under the faucet. On 9 March 2014, petitioner entered Mr. Kerr's cell with Ms. Sims, Alexander's staff psychologist. Although Mr. Kerr did not speak or sit up while petitioner and Ms. Sims were in Mr. Kerr's cell, petitioner left Mr. Kerr in handcuffs. Ms. Sims asked petitioner if a Code Blue should be called and petitioner said no. At the end of petitioner's shift, he completed a report on the day's events, called an "OIC report." Petitioner failed to note in his OIC reports for either 8 or 9 March 2014 that a Code Blue had been called for Mr. Kerr or that Mr. Kerr was still in handcuffs at the end of the 9 March 2014 day shift.
 

 Petitioner was not at work on 10 or 11 March 2014. When petitioner returned to work on 12 March 2014, he directed Sergeant Johnson to prepare Mr. Kerr for transport to Central Prison. When Sergeant Johnson entered Mr. Kerr's cell, he found Mr. Kerr's handcuffs filled with embedded fecal matter, and saw cuts and abrasions on Mr. Kerr's wrists resulting from wearing the mechanical cuffs for an extended period of time. Petitioner directed his staff to use bolt cutters to remove the handcuffs, and Mr. Kerr was transported to Central Prison. Mr. Kerr was pronounced dead upon his arrival at Central Prison. The coroner determined that Mr. Kerr's cause of death was dehydration.
 

 Following Mr. Kerr's death, DPS conducted an investigation which included interviewing witnesses, including petitioner, and reviewing documents. DPS conducted a pre-disciplinary conference with petitioner on 4 April 2014, and on 7 April 2014 petitioner received a letter from DPS informing him that he was being terminated from employment for grossly inefficient job performance, and stating that:
 

 ... Management has decided to dismiss you, effective April 7, 2014 based on Grossly Inefficient Job Performance[.] ...
 

 *200
 
 This decision was made after a review of all of the information available, including prior disciplinary action, the current incident of Grossly Inefficient Job Performance, and the information you provided during the
 
 *514
 
 pre-disciplinary conference. The specific conduct reason(s) for your dismissal [are] as follows:
 

 On March 18, 2014, you were interviewed as part of [an investigation] ... into the death of inmate Michael Kerr. You were also interviewed on April 1, 2014 as part of an internal investigation into this same matter. During both interviews, you stated that you were notified on March 8, 2014 of a Code Blue ... for inmate Kerr.... You stated you told inmate Kerr to remain on the bed until all staff were out of the cell and the door was secured. You indicated that once the door was secured, you ordered inmate Kerr to come to the door to take off the restraints and he refused. You further indicated that you informed Sergeant Johnson to have staff check Kerr every 15 minutes and offer Kerr the opportunity to have the restraints removed. You also stated, "Due to him being a segregated inmate, I was not going to risk staff safety by removing the handcuffs while staff was in his cell. He had to be behind a secured door." ...
 

 Records indicate that you also worked on March 9, 2014.... You indicated that you were aware of [Mr. Kerr's] mental state and you had notified mental health staff.
 

 Investigators determined that inmate Kerr remained handcuffed for a period of five (5) days based on your instructions to staff to have [the] inmate remain cuffed until he was willing to submit to removal of the restraints through the cell door.
 

 At no time during your assigned working hours on March 8, 2014 did you communicate the status of inmate Kerr, his refusal to submit to handcuff removal, or the fact that inmate Kerr's condition was deteriorating to the Assistant Superintendent for Custody and Operations.
 

 You failed to Initiate an Incident report for a documented Code Blue Emergency.
 

 According to the Division of Prisons' Policy and Procedures Manual, F.1504 (h)(1-2), ... The use of instruments of
 
 *201
 
 restraint, such as handcuffs ... are used only with approval by the facility head or designee.
 

 (1) Instruments of restraint will be utilized only as a precaution against escape during transfer, [to] prevent self-injury or injury to officers or third parties, and/or for medical or mental health reasons...."
 

 The Office of State Human Resources Policy Manual, Section 7, page 2, states, "Grossly Inefficient Job Performance is the failure to satisfactorily perform job requirements as set out in the job description, work plan, or as directed by the management of the work unit or agency, and the act or failure to act causes or results in: Death or serious bodily injury or creates conditions that increase the chance for death or serious bodily injury to an employee(s) or to members of the public or to a person(s) for whom the employee has the responsibility;"
 

 Your willful violation of these policies constitutes grossly inefficient job performance....
 

 After a review of the information provided, to include the Pre-Disciplinary Conference, I saw no mitigating factors regarding your actions in this matter that would warrant action less than dismissal....
 

 Petitioner appealed his termination to DPS, and on 16 July 2014 he received a letter from DPS informing petitioner that the letter was a final agency decision to uphold termination of petitioner's employment. The letter stated that:
 

 On March 8, 2014, a Code Blue (Medical Emergency) was called because segregation staff observed inmate Kerr to be unresponsive in his cell.... You ordered inmate Kerr to come to the door to have the handcuffs removed and he did not. You then told inmate Kerr that until he got up and came to the cell door and asked to have his handcuffs removed his handcuffs would not be removed. At that time, you were aware that inmate Kerr had serious mental health issues....
 

 There was no record of proper medical evaluation during the time inmate Kerr was in restraints over the next five days.... Reports indicated that one time inmate Kerr
 
 *202
 
 was observed standing; other reports indicated that he appeared to be asleep, or awake on his bunk....
 
 *515
 
 Nevertheless, you did not remove inmate Kerr's handcuffs because inmate Kerr did not come to the door to have the restraints removed. Your shift was scheduled off for the next two days. You left the correctional institution with your order regarding the procedure for removal of the handcuffs still in place.
 

 On March 12, 2014, four days after your original order that inmate Kerr remain in handcuffs until he asked to have them removed, you came back on shift as the OIC and you instructed Correctional Sergeant William Johnson to prepare inmate Kerr for transfer to Central Prison. Sergeant Johnson went to the Segregation Unit and found inmate Kerr in his cell with his pants and underwear down around his ankles. He had urinated and defecated on himself....
 

 Staff could not unlock the handcuffs because they were clogged with dried feces.... Staff observed cuts and bruises on inmate Kerr's wrists.... Inmate Kerr was not seen by medical staff on March 12, 2014 prior to leaving for Central Prison. Inmate Kerr left Alexander Correctional Institution at approximately 8:30 AM and arrived at Central Prison around 11:30 AM. When he was received at Central Prison, he had expired.
 

 ...
 

 You were the OIC responsible for the fact that inmate Kerr remained in handcuffs for five days. There was no valid reason for inmate Kerr to have remained in handcuffs for five days.... In addition, it should have been obvious that inmate Kerr was not a threat to any custody staff, that no restraints were necessary, and that he was in need of medical attention.... It was your obligation to remove the restraints; it was not incumbent upon inmate Kerr to ask you to do so. It was obvious from the video footage taken on March 12, 2014, that after five days inmate Kerr was so incapacitated that he was not ambulatory and could not get himself into a wheelchair from the bed, and yet the restraints were still not removed.... The medical testimony indicated that the cumulative evidence of
 
 *203
 
 inmate Kerr's behavior shows he was nonresponsive and not being intentionally noncompliant.
 

 As mitigation you argued that all of the other captains at Alexander had been returned to work and that you were the only Captain terminated. I find that you were differently situated from all of the other Captains because your behavior in ordering that inmate Kerr be handcuffed until he could ask to have them removed was particularly culpable behavior and may have played a role in inmate Kerr's death. Because there was no superintendent at Alexander Correctional Institution at this time, it was particularly incumbent upon you to be aware of the risks to inmates and staff and to obtain adequate guidance and supervision....
 

 [A]t no time did you seek medical advice about Inmate Kerr's condition on March 10-12, 2014. In addition, you were responsible for knowing the consequences of your order to keep inmate Kerr in handcuffs and for ensuring that he was able to take care of his personal needs, including exercise and taking nourishment.
 

 Inmate Kerr was about 5'9? tall, weighing around 300 pounds, and medically determined to be obese.... You attempted to place the responsibility on another employee[.] ... You also argued that you could not have ordered inmate Kerr's handcuffs to be removed[.] ...
 

 During your dismissal appeal hearing you ... stated that inmate Kerr was in handcuffs for disciplinary reasons[.] ... [T]he use of handcuffs was inappropriate for disciplinary reasons.... When questioned as to how inmate Kerr was supposed to handle his bodily functions if he was left in handcuffs, you indicated that essentially it was inmate Kerr's problem for not coming to the door to have his handcuffs removed. You also admitted that it appeared to you that that inmate Kerr's health was deteriorating over the two days you were off work, yet instead of sending inmate Kerr for medical care at the closest medical facility, he was transported three hours away to Central Prison, where he arrived dead. There appears to be no valid reasons for the restraints to have been put on
 
 *516
 
 initially when the inmate Kerr was examined as a result of the Code Blue. There were no valid reasons that the handcuffs were not
 
 *204
 
 removed when the exam was concluded. And there was no valid reason inmate Kerr did not receive medical care.
 

 I have also considered as an aggravating circumstance your complete lack of remorse or belief that you did anything wrong with regard to inmate Kerr.... Your belief that you did nothing wrong in the face of this inmate's death is evidence that you cannot continue to be employed by the Department of Public Safety. No other level of disciplinary action is sufficient to protect the inmates in the custody of the Department of Public Safety and address your conduct and behavior.
 

 In conclusion, you were the Officer in Charge (OIC) at Alexander Correctional Institution on March 8, 2014. A Code Blue was called that inmate Michael Kerr was nonresponsive. Your staff responded to the Code Blue and medical staff examined inmate Kerr. After the exam, the leg restraints were removed but not the handcuffs, and staff exited the cell.... You then ordered that inmate Kerr remain in handcuffs until he asked to have them removed and came to the door for that purpose. You did not ensure that the restraint policies were complied with. As a result of your order, inmate Kerr remained in the handcuffs for five days. On March 12, 2014, prior to inmate Kerr being transported to Central Prison, [Mr. Kerr's] handcuffs had to [be] cut off because they were encrusted with fecal matter. When he arrived at Central Prison, inmate Kerr was found to be unresponsive. He was pronounced dead on arrival at Central Prison.
 

 On 7 August 2014 petitioner filed a petition for a contested case hearing with the North Carolina Office of Administrative Hearings. A three day hearing was conducted before the ALJ beginning on 2 December 2015. During the hearing petitioner acknowledged that as a correctional captain he was "required to have considerable knowledge of the department's rules, policies, and procedures concerning the custody, care, treatment and training of inmates" and that his position required "the exercise of good judgment and discretion" given that a particular situation might not be addressed in the written policies. Petitioner admitted that the responsibilities of an OIC included a duty to "take corrective action on any condition that may affect the security, safety, or welfare of a variety of people, including inmates," and "to document all unusual and important activities in the OIC shift report." Petitioner also conceded
 
 *205
 
 that he was familiar with the "[DPS] Division of Prisons, Alexander Correctional Institution Standard Operating Procedure Section .0427, Restraint Procedures" which governed the correctional officers' use of restraints, including handcuffs. These regulations state that:
 

 Restraints may be used as a precaution against escape during transfer for medical reasons, [to] prevent self-injury, to protect staff or others or [to] prevent property damage or manage disruptive behavior where other means have failed. Restraints are never to be applied for punishment, and must be removed as soon as possible as directed by the circumstances requiring application.
 

 Regarding the conditions of Mr. Kerr's confinement, petitioner agreed that Mr. Kerr was initially placed in handcuffs on 8 March 2014 to "secure him so medical staff could go in and evaluate him." Petitioner also admitted that he and Ms. Sims entered Mr. Kerr's cell unaccompanied by "an extraction team" and that petitioner did not carry a shield. Petitioner testified that he knew that Mr. Kerr "had been at one time [in] residential mental health," and that Mr. Kerr had never acted violently towards prison staff. Petitioner also admitted that during the 15 minute checks ordered by petitioner, the prison staff did not enter Mr. Kerr's cell or check to see if the cuffs were hurting Mr. Kerr.
 

 The ALJ also heard testimony from several prison officials. Stephanie Leach testified that she was employed by DPS to investigate events such as the death of an inmate, and that she led the investigation into Mr. Kerr's death. Ms. Leach reviewed records indicating that Mr. Kerr had not been observed in a standing position after 8 March 2014. Ms.
 
 *517
 
 Leach testified that, based upon her review of a videotape and Mr. Kerr's medical records, Mr. Kerr was not capable of walking to the cell door, and was not intentionally refusing to do so, and that the coroner determined that Mr. Kerr's cause of death was dehydration.
 

 Marvin Polk testified that had worked for DPS for over thirty years and that he conducted internal investigations into employee misconduct. In over thirty years' experience with DPS, he had never heard of an inmate being restrained in handcuffs for five days. Mr. Polk concluded that respondent "did not use sound judgment and reasoning" by leaving Mr. Kerr handcuffed for five days, and that it was the responsibility of the OIC to ensure that an inmate received necessary medical treatment. Kenneth Lassiter, DPS's Deputy Director of Operations, testified that an OIC has the authority to make decisions that are necessary for an inmate's health or safety. Mr. Lassiter did not think handcuffs should
 
 *206
 
 have been applied to Mr. Kerr. When handcuffs were applied, custodial staff should have checked every fifteen minutes to make sure the handcuffs weren't causing any injury, because mechanical handcuffs of the kind used on Mr. Kerr had the potential for a serious risk of harm to an inmate, because of the risk of fluid retention. Mr. Lassiter also testified that it was "rare that metal restraints are on an inmate for more than four hours," and that he had never heard, in more than twenty-five years of working for DPS, of another instance of an inmate left in handcuffs for such "an extended amount of time."
 

 George Solomon testified that he was DPS's Director of Prisons, that he had been employed by DPS for over thirty-five years, and that DPS's "mission is to maintain the public safety and safe and humane treatment of our stakeholders, our inmate population, [and] make sure we take care of them [.]" Mr. Solomon was responsible for the decision to fire petitioner, based on a review of interviews and petitioner's statements. Mr. Solomon testified that petitioner's acts of leaving handcuffs on Mr. Kerr and not providing Mr. Kerr with milk might have contributed to Mr. Kerr's "decompensation and deterioration."
 

 On 23 January 2015 the ALJ entered a Final Decision that affirmed DPS's decision to uphold petitioner's termination. The ALJ concluded that respondent had shown by the preponderance of the evidence that it had just cause to terminate petitioner for grossly inefficient job performance. The ALJ's conclusions were supported by more than eighty findings of fact, which were based on a voluminous transcript of over 600 pages and hundreds of pages of exhibits.
 

 Petitioner has appealed the ALJ's Final Decision to this Court.
 

 II. Standard of Review
 

 The standard of review of an administrative agency's decision is set out in N.C. Gen.Stat. § 150B-51 (2013), which provides that
 

 (b) The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
 

 (1) In violation of constitutional provisions;
 

 (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
 

 (3) Made upon unlawful procedure;
 

 *207
 
 (4) Affected by other error of law;
 

 (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
 

 (6) Arbitrary, capricious, or an abuse of discretion.
 

 (c) ... With regard to asserted errors pursuant to subdivisions (1) through (4) of subsection (b) of this section, the court shall conduct its review of the final decision using the
 
 de novo
 
 standard of review. With regard to asserted errors pursuant to subdivisions (5) and (6) of subsection (b) of this section, the court shall conduct its review of the final decision using the whole record standard of review.
 

 "Under the whole record test, the reviewing court must examine all competent evidence to determine if there is substantial evidence to support the administrative agency's
 
 *518
 
 findings and conclusions."
 
 Henderson v. N.C. Dep't of Human Resources,
 

 91 N.C.App. 527
 
 , 530,
 
 372 S.E.2d 887
 
 , 889 (1988) (citation omitted). " '[T]he whole record test is not a tool of judicial intrusion; instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence.' "
 
 N.C. Dep't of Env't & Natural Res. v. Carroll,
 

 358 N.C. 649
 
 , 674,
 
 599 S.E.2d 888
 
 , 903-04 (2004) (quoting
 
 In re Rogers,
 

 297 N.C. 48
 
 , 65,
 
 253 S.E.2d 912
 
 , 922 (1979) ). Therefore, the whole record test "does not permit the reviewing court to substitute its judgment for the agency's as between two reasonably conflicting views[.]"
 
 Lackey v. Dep't of Human Resources,
 

 306 N.C. 231
 
 , 238,
 
 293 S.E.2d 171
 
 , 176 (1982).
 

 "Where the petitioner alleges that the agency decision was based on error of law, the reviewing court must examine the record
 
 de novo,
 
 as though the issue had not yet been considered by the agency."
 
 Souther v. New River Area Mental Health,
 

 142 N.C.App. 1
 
 , 4,
 
 541 S.E.2d 750
 
 , 752 (internal quotation omitted),
 
 aff'd per curiam,
 

 354 N.C. 209
 
 ,
 
 552 S.E.2d 162
 
 (2001). "Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes its own judgment for that of the [ALJ]."
 
 In re Appeal of the Greens of Pine Glen Ltd. P'ship,
 

 356 N.C. 642
 
 , 647,
 
 576 S.E.2d 316
 
 , 319 (2003) (citing
 
 Mann Media, Inc. v. Randolph Cty. Planning Bd.,
 

 356 N.C. 1
 
 , 13,
 
 565 S.E.2d 9
 
 , 17 (2002) ). In addition, "[a]n administrative agency's interpretation of its own regulations is entitled to deference unless it is plainly erroneous or inconsistent with the regulation's plain text."
 
 Total Renal Care of N.C. v. North Carolina HHS,
 
 --- N.C.App. ----, ----,
 
 776 S.E.2d 322
 
 , 327 (2015) (citing
 
 York Oil Co. v. N.C. Dep't of Env't,
 

 164 N.C.App. 550
 
 , 554-55,
 
 596 S.E.2d 270
 
 , 273 (2004) ).
 

 *208
 

 III. Denial of Petitioner's Motion in Limine
 

 Petitioner argues first that the ALJ erred by denying his motion
 
 in limine
 
 seeking "to restrict the respondent from producing evidence of anything other than the reasons that were [stated] in [petitioner's] April 7, 2014, dismissal letter as far as reasons to justify his termination." Petitioner argues that the ALJ violated the notice requirements of N.C. Gen.Stat. § 126-35 by considering facts and circumstances that were not specifically discussed in petitioner's pre-disciplinary letter. We conclude that petitioner's argument lacks merit.
 

 In this case, petitioner makes only one challenge to evidence admitted over his objection, consisting of petitioner's assertion that the ALJ admitted evidence of a prior disciplinary warning against petitioner over petitioner's objection. We hold that evidence of petitioner's prior disciplinary history was properly considered as part of the ALJ's review of the level of discipline imposed against petitioner.
 
 See
 

 Carroll,
 

 358 N.C. at 670
 
 ,
 
 599 S.E.2d at 901
 
 (including, as part of its review of whether the discipline imposed was appropriate, the fact that the petitioner "has been a reliable and valued employee ... for almost twenty years with no prior history of disciplinary actions against him."). "Career state employees, like petitioner, may not be discharged, suspended, or demoted for disciplinary reasons without 'just cause.' " N.C. Gen.Stat. § 126-35(a). This requires the reviewing tribunal to examine ... "whether [the petitioner's] conduct constitutes just cause for the disciplinary action taken."
 
 Warren v. Dep't of Crime Control,
 

 221 N.C.App. 376
 
 , 379,
 
 726 S.E.2d 920
 
 , 923 (quoting
 
 Carroll
 
 at 665,
 
 599 S.E.2d at 898
 
 (internal quotation omitted)),
 
 disc. review denied,
 

 366 N.C. 408
 
 ,
 
 735 S.E.2d 175
 
 (2012). In
 
 Wetherington v. N.C. Dep't of Pub. Safety,
 
 ---N.C. ----, ----,
 
 780 S.E.2d 543
 
 , 548 (2015) our Supreme Court addressed the issue of an agency's discretion to determine the appropriate discipline:
 

 Just cause "is a flexible concept, embodying notions of equity and fairness, that can only be determined upon an examination of the facts and circumstances of each individual case." ... [The employee's supervisor] confirmed that he [believed that he] could not impose a punishment other than dismissal for any violation, apparently regardless of factors such as the
 
 severity of the violation, the subject matter involved, the resulting harm, the trooper's work history, or discipline imposed in other cases
 

 *519
 

 involving similar violations.
 
 We emphasize that
 
 consideration of these factors is an appropriate and
 

 *209
 

 necessary component
 
 of a decision to impose discipline upon a career State employee[.]
 

 Wetherington,
 
 --- N.C. at ----,
 
 780 S.E.2d at 548
 
 (quoting
 
 Carroll
 
 ,
 
 358 N.C. at 669
 
 ,
 
 599 S.E.2d at 900-901
 
 (internal quotation omitted)) (emphasis added).
 

 We have also reviewed petitioner's challenges to the admission of evidence that was not the subject of an objection at the hearing. N.C. Gen.Stat. § 126-35(a) requires that if disciplinary action is contemplated against a State employee, "the employee shall, before the action is taken, be furnished with a statement in writing setting forth the specific acts or omissions that are the reasons for the disciplinary action and the employee's appeal rights."
 

 This Court has interpreted section 126-35(a) as requiring the written notice to include a sufficiently particular description of the "incidents [supporting disciplinary action] ... so that the discharged employee will know precisely what acts or omissions were the basis of his discharge." Failure to provide names, dates, or locations makes it impossible for the employee "to locate [the] alleged violations in time or place, or to connect them with any person or group of persons," thereby violating the statutory requirement of sufficient particularity.
 

 Owen v. UNC-G Physical Plant,
 

 121 N.C.App. 682
 
 , 687,
 
 468 S.E.2d 813
 
 , 817 (quoting
 
 Employment Security Comm. v. Wells,
 

 50 N.C.App. 389
 
 , 393,
 
 274 S.E.2d 256
 
 , 259 (1981) ),
 
 disc. review improvidently allowed, review dismissed,
 

 344 N.C. 731
 
 ,
 
 477 S.E.2d 33
 
 (1996).
 

 In this case, petitioner received a pre-disciplinary letter on 7 April 2014 that set out the "names, dates, [and] locations" pertinent to his dismissal. This letter made it clear that the "specific acts or omissions" leading to petitioner's termination were petitioner's acts or omissions as related to Mr. Kerr's conditions of confinement in March 2014, and specifically as pertaining to petitioner's role in allowing Mr. Kerr to remain in handcuffs for five days without appropriate attention to his physical and medical condition.
 

 On appeal, petitioner argues that the ALJ "erred as a matter of law when she allowed Respondent to present reasons other than those listed in the 7 April 2014 dismissal letter and made findings of fact and conclusions of law based on those additional reasons by which she found just cause for the termination of Petitioner's employment." Petitioner fails, however, to identify any evidence considered by the ALJ that was
 
 *210
 
 not directly related to petitioner's role in Mr. Kerr's conditions of confinement during March 2014, and our own review indicates that the evidence challenged by petitioner consisted entirely of the facts and circumstances surrounding Mr. Kerr's death and petitioner's actions or inactions relevant to Mr. Kerr's death. Petitioner is apparently arguing that he is entitled to notice, not only of the acts and omissions that were the basis of his termination, but also to notice of every item of evidence pertaining to these acts and omissions. Petitioner cites no authority for his vastly expanded view of "notice" and we know of none. We conclude that petitioner is not entitled to relief on the basis of this issue.
 

 IV. Factual Support for the ALJ's Findings of Fact
 

 Petitioner argues next that certain of the ALJ's findings of fact are not supported by substantial evidence. The majority of the ALJ's findings are not challenged and thus are conclusively established on appeal.
 
 Koufman v. Koufman,
 

 330 N.C. 93
 
 , 97,
 
 408 S.E.2d 729
 
 , 731 (1991) ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal.") (citation omitted). Moreover, after careful review of the record and the ALJ's order, we conclude that in order to determine whether the ALJ properly ruled that respondent established by a preponderance of the evidence that respondent had just cause to terminate petitioner's employment, it is not necessary for us to assess the evidentiary support for all of the findings challenged by petitioner. We will, however, review the evidence
 
 *520
 
 supporting those findings that we find to be material to the ALJ's decision.
 

 We review a challenge to the ALJ's findings to determine whether the findings are supported by substantial evidence. N.C. Gen.Stat. § 150B-51(b), (c). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Even if the record contains evidence that could also support a contrary finding, we may not substitute our judgment for that of the ALJ and must affirm if there is substantial evidence supporting the ALJ's findings.
 

 Renal Care,
 
 --- N.C.App. at ----,
 
 776 S.E.2d at 328
 
 (quoting
 
 Surgical Care Affiliates v. N.C. Dep't of Health & Human Servs.,
 

 235 N.C.App. 620
 
 , 622,
 
 762 S.E.2d 468
 
 , 470 (2014) (internal quotation omitted),
 
 disc. review denied,
 

 368 N.C. 242
 
 ,
 
 768 S.E.2d 564
 
 (2015) ).
 

 We first review petitioner's challenge to Finding No. 26, which states that "[t]he evidence indicates that Inmate Kerr was not refusing to have
 
 *211
 
 his handcuffs removed but was unresponsive due to his mental health and/or physical condition." This finding is supported in part by Ms. Leach's testimony, including the following:
 

 Q: Based on your review, did you determine if Mr. Kerr was refusing orders or just not responding?
 

 MS. LEACH: Mr. Kerr was just not responding, which is different from refusing.
 

 Q: Based on your experience as a registered nurse, did it appear to you that Mr. Kerr was capable of walking on his own accord?
 

 MS. LEACH: No.
 

 This finding is further supported by Mr. Lassiter's testimony that "Mr. Kerr's condition, from everything that I've read and could understand, prevented him from coming to the door." Petitioner acknowledges this testimony, but argues that the validity of these witness's testimony was impeached on cross-examination. "It is for the agency, not a reviewing court, 'to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence[,] if any.' "
 
 Carroll
 
 at 674,
 
 599 S.E.2d at 904
 
 (quoting
 
 State ex rel. Utils. Comm'n v. Duke Power Co.,
 

 305 N.C. 1
 
 , 21,
 
 287 S.E.2d 786
 
 , 798 (1982) ). We conclude that this finding is supported by substantial evidence.
 

 Petitioner also challenges the evidentiary support for Finding No. 40, which states that the ALJ "finds as fact that Petitioner did not view Inmate Kerr as a threat to the safety of Ms. Simms or himself on March 9." Petitioner argues that the fact that he entered Mr. Kerr's cell on 9 March 2014 without an extraction team or a safety shield "does not prove that [Mr. Kerr] was not considered to be a threat." We are not required to determine, however, whether this evidence "proves" petitioner's state of mind, but whether it adequately supports the ALJ's inference in this regard. We hold that the fact that petitioner entered Mr. Kerr's cell with Ms. Simms without employing the institutional safety precautions supports the ALJ's finding that petitioner did not regard Mr. Kerr as a threat.
 

 We next review petitioner's challenge to Finding No. 46 that "[n]o evidence was offered that Petitioner ensured that custody staff actually performed checks to see if the handcuffs were too tight or causing any harm to Inmate Kerr." Petitioner does not dispute the factual accuracy of this finding, and acknowledges his own testimony that petitioner
 
 *212
 
 "did not instruct custody staff to perform checks on the restraints to see if they were too tight or causing injury to Inmate Kerr[.]" Instead petitioner contends that such safety checks were not his responsibility. However, the scope of petitioner's responsibility is not relevant to the accuracy of the ALJ's finding that petitioner did not ensure that custody staff monitored Mr. Kerr's condition with respect to the handcuffs. Petitioner also argues that this finding "shifted the burden of proof" to petitioner. Finding No. 46 does not address or shift the burden of proof, but simply notes that the evidence of petitioner's failure to supervise appropriate safety checks was uncontradicted by any other evidence. We hold that this finding is supported by substantial evidence.
 
 *521
 
 Petitioner next challenges Finding No. 47, which states that petitioner "concedes that in his experience no inmate had ever been left in handcuffs for more than a few hours even when the inmate was refusing to have the handcuffs removed." On appeal, petitioner argues that he did not concede that no inmate had
 
 ever
 
 been left in handcuffs for more than a few hours, but only that such a situation was "unusual." Assuming,
 
 arguendo,
 
 that the ALJ should have found that petitioner conceded it was "unusual" for an inmate to be in handcuffs for an extended period of time, we hold that this does not require reversal of the ALJ's order.
 

 Petitioner next challenges the evidentiary support for Finding No. 51, which states that "Petitioner's belief that Inmate Kerr was faking and being defiant was the basis of his decision to leave him in handcuffs until he came to the cell door to have them removed." We hold that this finding is amply supported by substantial evidence. For example, petitioner testified as follows:
 

 Q: Okay. And I believe you testified earlier that you did not believe initiating any type of disciplinary action against Mr. Kerr would change his behavior.
 

 PETITIONER: Disciplinary action-yes, ma'am, I testified to that.
 

 Q: What behavior did you want him to change?
 

 PETITIONER: His behavior of not coming to the door.
 
 Refusing to come to the door
 
 and be left in handcuffs. I wanted the handcuffs removed from him.
 

 (emphasis added). Petitioner's own testimony expressly indicates that he viewed Mr. Kerr as acting defiantly, and thus supports the ALJ's finding.
 

 *213
 
 Petitioner also challenges Finding No. 54, which states that on 12 March 2014 Sergeant Johnson "found Inmate Kerr lying in his own urine and feces with his pants and underwear around his ankles. He was not responsive to verbal commands but appeared to be semi-conscious." Petitioner's challenge is limited to the ALJ's use of the phrase "semi-conscious." It is undisputed, however, that Mr. Kerr was unresponsive, said nothing beyond repeating the word "Please," and fell over when placed in a wheelchair. This finding is supported by substantial evidence.
 

 Petitioner next challenges Findings Nos. 84 and 85, which state that:
 

 84. Based upon all of the admissible evidence, the Undersigned finds as fact that Petitioner did not report a Code Blue incident or ensure that subordinate staff completed a report.
 

 85. Based upon all of the admissible evidence, the Undersigned finds as fact that Petitioner did not complete the daily OIC reports as required of an Officer In Charge.
 

 Petitioner admits that he did not report the Code Blue incident, but offers the excuse that other correctional officers also failed to do so, a fact which if true does not change the factual accuracy of the finding. Regarding petitioner's failure to complete daily OIC reports, petitioner asserts that this was not specifically mentioned in his pre-disciplinary letter. As discussed above, however, petitioner's neglect of his responsibility to complete OIC reports was a part of petitioner's acts and omissions as specifically related to Mr. Kerr's conditions of confinement in March 2014. The ALJ did not err by making these findings.
 

 Finally, petitioner challenges Findings Nos. 86, 87, and 88, which state that:
 

 86. Based upon all of the admissible evidence, the Undersigned finds as fact that Petitioner did not exercise the discretion or good judgment required of a Correctional Captain.
 

 87. Based upon all of the admissible evidence, the Undersigned finds as fact that Petitioner did not ensure the safe and humane treatment of Inmate Kerr.
 

 88. After considering all of the documentary and testimonial evidence admitted in this contested case, taking particular note of the Petitioner's written statements and testimony, the Undersigned finds as fact that Petitioner
 
 *214
 
 fails to accept any personal responsibility for his actions or inactions that caused harm to Inmate Kerr.
 

 Findings Nos. 86 and 87 are supported by the ALJ's other findings of fact that are
 
 *522
 
 either unchallenged or which we have determined to be supported by substantial evidence. Petitioner argues that his failure to accept personal responsibility was not listed as a reason for termination in his pre-disciplinary letter. We conclude, however, that this circumstance was relevant to the ALJ's review of the level of discipline imposed. For the reasons discussed above, we conclude that the challenged findings were supported by substantial evidence, and that petitioner is not entitled to relief on this basis.
 

 V. Just Cause for Petitioner's Termination
 

 Petitioner's final argument is that the ALJ erred by finding and concluding that respondent had just cause to terminate petitioner for grossly inefficient job performance. We disagree.
 

 N.C. Gen.Stat. § 126-35(a) provides that "[n]o career State employee subject to the North Carolina Human Resources Act shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause.... The State Human Resources Commission may adopt, subject to the approval of the Governor, rules that define just cause." Pursuant to this grant of authority, the North Carolina Office of State Human Resources has stated that "[t]here are two bases for the discipline or dismissal of employees under the statutory standard for "just cause" as set out in G.S. 126-35. These two bases [include] (1) Discipline or dismissal imposed on the basis of unsatisfactory job performance, including grossly inefficient job performance." 25 N.C.A.C. 1J.0604(b)(1). In this case, petitioner was discharged for grossly inefficient job performance, which is defined by 25 N.C.A.C. 1J.0614(5) as follows:
 

 (5) Gross Inefficiency (Grossly Inefficient Job Performance) means a type of unsatisfactory job performance that occurs in instances in which the employee: fails to satisfactorily perform job requirements as specified in the job description, work plan, or as directed by the management of the work unit or agency; and, that failure results in
 

 (a) the creation of the potential for death or serious bodily injury to an employee(s) or to members of the public or to a person(s) over whom the employee has responsibility[.] ...
 

 *215
 
 In order to review the ALJ's determination that respondent had established that respondent had just cause to terminate petitioner, we must consider petitioner's acts and omissions in the context of the duties of his position. As a Correctional Captain, petitioner was responsible for interpreting, developing, and implementing standard operating procedures and emergency plans, as well as reviewing the work performed by others to ensure its compliance "with the goals and the missions of the ... Department of Public Safety," including DPS's goals of ensuring "the safety of the inmates" and "the humane confinement of inmates." During the hearing petitioner admitted that his position required "the exercise of good judgment and discretion" given that not every situation would be addressed in the written policies.
 

 In addition to his rank as a Correctional Captain, petitioner acted as the OIC on 8 and 9 March 2014. Petitioner testified that the OIC is "the individual that's left in charge of the daily running of the institution and the safety and welfare of the staff and the inmates at that institution." Mr. Polk testified that the duties of an OIC include the following:
 

 The officer-in-charge of each facility within the Division of Prisons or his or her designated representative will conduct a daily inspection of the facility for the purpose of detecting and eliminating all hazards to the security, health, sanitation, safety, and welfare of staff and inmates at the facility. No condition which constitutes a threat to the sanitation, safety, or security of the prison facility will be permitted to exist.
 

 Mr. Polk also testified that it was the responsibility of the OIC to ensure than an inmate received necessary medical care. In addition, Mr. Polk explained that, as OIC, petitioner had a responsibility to follow up on petitioner's orders regarding Mr. Kerr by communicating with the Alexander staff on 10 and 11 March when petitioner was not at the facility:
 

 Q. Now, how can Mr. Blackburn be responsible for what happened on March
 
 *523
 
 10th and 11th if he wasn't at work that day?
 

 MR. POLK: Because on March 9th, he left the institution knowing that the inmate was still handcuffed inside the cell, and he had a duty to follow up to find out what his situation was. He was the officer-in-charge that placed those procedures in effect that no one should remove the handcuffs until he got up and walked to the door.
 

 *216
 
 We conclude that petitioner had a highly placed supervisory role at Alexander, in which he gave orders to other correctional staff and had a great deal of responsibility. As a correctional captain and the OIC, petitioner was required to exercise good judgment and make discretionary decisions to further the health and safety of both the correctional staff and the inmates.
 

 We next consider the ALJ's findings of fact to determine whether they support the ALJ's finding and conclusion that there was just cause to terminate petitioner for grossly inefficient job performance. The ALJ made the following findings of fact which are either unchallenged on appeal or which we have determined to be supported by substantial evidence:
 

 1. Petitioner was employed by Respondent North Carolina Department of Public Safety (DPS) for fourteen (14) years with promotions through the custody ranks from a Correctional Officer to a Correctional Captain.
 

 2. At the time of his dismissal, Petitioner was a Correctional Captain, the second highest rank at the Alexander Correctional Institution ("Institution")[.]
 

 3. Petitioner testified that he was aware of and familiar with the position description of a Correctional Captain which states that "[t]he Correctional Captain is responsible for interpreting, developing and implementing Standard Operating Procedures, Post Orders, and Emergency Plans which are needed to carry out the custody assignments of the facility." The Correctional Captain also "assume[s] the responsibilities of the Assistant Superintendent for Custody and Operations in the absence of the Assistant Superintendent for Custody and Operations." The Correctional Captain "has the responsibility of reviewing work performed and ensuring that it is in compliance with the goals and missions of the Department of Corrections." An important goal of DPS is to ensure the safety and humane confinement of inmates.
 

 4. Petitioner would regularly perform duties as the Officer In Charge ("OIC") of the Institution during his 12-hour duty assignment. An OIC has "the authority to make spontaneous decisions regarding Institution operational issues, while maintaining the safety and security of Staff, agents, volunteers, visitors, and inmates throughout the Institution
 
 *217
 
 areas of control ... [and] will directly supervise and/or monitor all areas of the Institution regarding enforcement of orderly conduct, sanitary conditions, and safety."
 

 5. Petitioner testified that as OIC he was responsible for the daily running of the Institution and for the safety and welfare of inmates and prison staff and to document all unusual and important activities in the OIC shift report.
 

 6. Petitioner was familiar with DPS's policies and procedures governing the treatment and confinement of inmates....
 

 ...
 

 8. Petitioner testified that he was aware that DPS's policies allow a considerable amount of discretion and use of judgment by a Correctional Captain because every scenario that prison staff may encounter is not covered by written policies and procedures.
 

 9. Petitioner testified that in February 2014, he knew that Inmate Kerr "had been at one time residential mental health." He also testified that he did not know whether inmate Kerr was on administrative segregation or disciplinary segregation status, or whether he was there for mental health observation.
 

 10. Over time, [Mr. Kerr's] segregation status was continued for disciplinary reasons for various non-violent infractions such as being loud in his cell and throwing water on the floor.
 

 ...
 

 *524
 
 15. Inmate Kerr had been tearing up the milk cartons and putting the pieces in his toilet thereby flooding the cell so Petitioner ordered that [Mr. Kerr] no longer be provided the milk with the nutraloaf.
 

 16. An unidentified individual put a note on Inmate Kerr's cell door "NO MILK PER CAPTAIN BLACKBURN." Petitioner testified ... that he knew the note was posted.
 

 17. Inmate Kerr was no longer provided milk with the nutraloaf after Petitioner's order was given, even during the shifts when Petitioner was not on duty.
 

 *218
 
 18. "Code Blue" is defined as any medical situation in the confines of the Institution requiring the immediate assistance of Medical Personnel.
 

 19. On March 8, 2014, Petitioner was the Correctional Captain on duty as the OIC when a Code Blue was called because segregation staff observed Inmate Kerr to be unresponsive in his cell.
 

 20. When Petitioner arrived at Inmate Kerr's cell, he was lying on his bed with leg restraints on and his hands cuffed in front. Inmate Kerr lay in the bed awake, not talking or moving and, at one point, staff could not tell if he was breathing.
 

 ...
 

 22. Petitioner then ordered Inmate Kerr to come to the cell door to have the mechanical handcuffs removed. Petitioner informed Inmate Kerr that his handcuffs would not be removed until he got up and came to the cell door.
 

 23. Petitioner directed the subordinate custody staff not to remove the handcuffs until Inmate Kerr came to the door and asked that the handcuffs be removed....
 

 24. Petitioner directed custody staff to perform 15-minute safety checks on Inmate Kerr's handcuffs. The safety checks consisted of looking through the cell door at Inmate Kerr. Neither Petitioner nor his subordinate staff checked to see if the handcuffs were too tight or causing physical harm to Inmate Kerr.
 

 25. Custody tablet reports indicate that at times staff would simultaneously report that Inmate Kerr appeared to be sleeping and [also that Mr. Kerr] refused to have his handcuffs removed.
 

 26. The evidence indicates that Inmate Kerr was not refusing to have his handcuffs removed but was unresponsive due to his mental health and/or physical condition.
 

 27. Petitioner did not complete an incident report for the Code Blue for Inmate Kerr on March 8, 2014 or report that Inmate Kerr was in restraints at the end of his shift on March 8, 2014....
 

 *219
 
 28. Petitioner noted the incident in the Shift Narrative for March 8 including the order not to remove the handcuffs until Inmate Kerr came to the cell door.
 

 ...
 

 30. As OIC, Petitioner failed to note on the OIC report on March 8, 2014 that Inmate Kerr was still in handcuffs.
 

 31. Petitioner did not call Assistant Superintendent Moose or any other resource available to him, such as the division duty officer, on March 8, 2014 to receive any type of guidance on what to do regarding Inmate Kerr. As OIC, Petitioner did not notify the Administrator (Moose) that Inmate Kerr remained in handcuffs at the end of shift.
 

 32. Petitioner was the OIC on March 9, 2014.
 

 ...
 

 36. On March 9, 2014, Petitioner entered Inmate Kerr's cell with staff psychologist Dara Simms without an extraction team, the required number of custody staff, or the shield for protection.
 

 ...
 

 38. Inmate Kerr remained on his bed unresponsive even after Petitioner tried to rouse him with his hand and by pulling Inmate Kerr's blanket out of his hands.
 

 39. Ms. Simms asked Petitioner if a Code Blue should be called, but Petitioner responded that a Code Blue was not necessary. They exited the cell and left Inmate Kerr in the handcuffs.
 

 40. The Undersigned finds as fact that Petitioner did not view Inmate Kerr as a threat to the safety of Ms. Simms or himself on March 9.
 

 *525
 
 41. Petitioner's notes in the Shift Narrative for March 9 record Inmate Kerr in handcuffs.
 

 42. At the end of his shift on March 9, 2014, Petitioner did not include in the OIC report that Inmate Kerr remained in handcuffs.
 

 *220
 
 43. Petitioner took his scheduled off-duty days on March 10 and 11, 2014 leaving in place his order that Inmate Kerr remain in handcuffs.
 

 44. Inmate Kerr remained in handcuffs from March 8 through March 12, 2014. Segregated Unit Shift Narratives completed by the OIC for each day record that Inmate Kerr remained in handcuffs in his cell.
 

 45. Neither Petitioner nor any of the other OICs noted that Inmate Kerr was still in handcuffs on their OIC reports for March 8, 9, 10, or 11, 2014.
 

 46. No evidence was offered that Petitioner ensured that custody staff actually performed checks to see if the handcuffs were too tight or causing any harm to Inmate Kerr.
 

 47. Petitioner concedes that in his experience no inmate had ever been left in handcuffs for more than a few hours even when the inmate was refusing to have the handcuffs removed.
 

 ...
 

 49. Despite the fact that Petitioner asserted that Inmate Kerr was simply refusing to obey his commands to come to the door to have the handcuffs removed, neither Petitioner nor any other custody staff ever initiated any type of disciplinary action against Inmate Kerr for his supposed refusal.
 

 50. The Undersigned finds as fact that Inmate Kerr was not in handcuffs due to violent behavior or any other behavioral reason.
 

 51. Petitioner's belief that Inmate Kerr was faking and being defiant was the basis of his decision to leave him in handcuffs until he came to the cell door to have them removed.
 

 52. Petitioner had the authority to simply order that the handcuffs be removed.
 

 53. On Mach 12 2014, Petitioner instructed Correctional Sergeant William Johnson to prepare Inmate Kerr for transport to Central Prison for mental health care.
 

 *221
 
 54. When Sergeant Johnson went to Inmate Kerr's cell he found Inmate Kerr lying in his own urine and feces with his pants and underwear around his ankles. He was not responsive to verbal commands but appeared to be semi-conscious.
 

 55. The Undersigned reviewed a video of Inmate Kerr being prepared for transport to Central prison: correctional staff physically put clean pants on Inmate Kerr; an additional officer was called to retrieve a wheelchair and then lifted Inmate Kerr into the wheelchair; he appeared to be slumping in the wheelchair.
 

 56. Sergeant Johnson informed Petitioner that the handcuffs could not be unlocked because they were caked with feces. Petitioner ordered Sergeant Johnson to use bolt cutters to remove the handcuffs.
 

 57. Various staff observed cuts and bruises on Inmate Kerr's wrist[s] from being in handcuffs for an extended period of time. Custody staff gave Inmate Kerr bandaids.
 

 58. Corrections Officer James Quigley stated in written statements dated March 18, 2014 and April 1, 2014 that when he assisted with dressing Inmate Kerr, he observed "open wounds on his right wrist." In his written statement, Sergeant Johnson noted "cuts" on Inmate Kerr's wrist caused by the handcuffs.
 

 59. No evidence was offered that Inmate Kerr ever got up from his bunk after the evening of March 8, 2014 until he was physically removed from his cell on March 12, 2014.
 

 60. Inmate Kerr did not see medical staff before leaving the Institution at 8:30 a.m. and was dead upon arrival at Central Prison at 11:30 a.m.
 

 61. As a result of Inmate Kerr's death, a Sentinel Event team conducted an investigation at the Institution into his death and submitted a report to DPS.
 

 62. As a result of that report, DPS's Professional Standards Office conducted internal
 
 *526
 
 investigations into the conduct of several employees, including Petitioner.
 

 63. Marvin Polk, an investigator with the Professional Standards Office with DPS, conducted the internal
 
 *222
 
 investigation regarding Petitioner's conduct and submitted a report dated April 5, 2014 to DPS management which recommended disciplinary action against Petitioner.
 

 64. Mr. Polk testified that in his thirty years working for the department he had never known an inmate to have been left in handcuffs for five days. He testified that handcuffs should have been removed from Inmate Kerr by assembling a team with a shield, removing the handcuffs and backing out of the cell.
 

 65. Kenneth Lassiter, Deputy Director of Operations for DPS, has been employed by DPS for twenty-five years and is familiar with the DPS's policy and procedures related to the care and confinement of inmates. He testified that handcuffs can create the potential for a serious risk of harm and, therefore, custody staff are trained to ensure that the handcuffs are not embedded or cutting into an inmate's skin.
 

 66. During the internal investigation, Petitioner gave three written statements.
 

 67. On March 18, 2014, Petitioner stated that he had dealt with Inmate Kerr a couple times on the segregation unit and mental health unit.
 

 68. On April 1, 2014, Petitioner stated that on March 9, 2014, he discussed with Nurse Triplett that he was aware of Inmate Kerr's mental state and that he "had notified Mental Health Staff."
 

 69. In another statement on April 1, 2014, Petitioner stated that a Code Blue was called on March 8, 2014 for Inmate Kerr.
 

 ...
 

 71. On April 4, 2014, Petitioner attended a Pre-Disciplinary Conference wherein the reasons supporting discipline were given to him. Petitioner was given an opportunity to respond orally and in writing. Petitioner gave verbal and written statements[.] ...
 

 72. On April 4, 2014, Petitioner submitted a written statement "to fully explain my thought process and decision making for the events that occurred over the weekend."
 

 *223
 
 He wrote that on March 8, he did not know Inmate Kerr's mental health status "or that his medical status had changed or that he needed any further medical assistance or needs."
 

 ...
 

 74. After the Pre-Disciplinary Conference, Director Solomon reviewed the Sentinel Event Report, Internal Investigation report, witness statements and all available information including Petitioner's prior active written warning and years of service, making a decision to discipline Petitioner. On July 18, 2013, Petitioner had received a written warning for Unacceptable Personal Conduct for falsely recording time on his timesheets. In that written warning Petitioner was directed to review department, division and facility policies and procedures specific to his responsibility as a Correctional Captain, and also was warned that if any further performance or conduct incidents occurred that he would be subject to discipline up to and including dismissal.
 

 75. On April 7, 2014, Petitioner was dismissed based upon Grossly Inefficient Job Performance.
 

 76. Respondent's dismissal letter dated April 7, 2014, states the specific conduct as reasons for the dismissal.
 

 77. Respondent's dismissal letter dated April 7, 2014, is based upon the Division of Prison's Policy and Procedures Manual, P.1504(h)(1-2) which states:
 

 ....The use of instruments of restraint, such as handcuffs, leg cuffs, waist chains, black boxes and soft restraints are used only with approval by the facility head or designee.
 

 (1) Instruments of restraint will be utilized only as a precaution against escape during transfer, [to] prevent self-injury or injury to officers or third parties, and/or for medical or mental health reasons....
 

 78. Petitioner appealed his dismissal to the Employee Advisory Committee where
 
 *527
 
 he was given the opportunity to speak and present evidence to the committee.
 
 *224
 
 79. In his Step 2 Grievance Filing, concerning Inmate Kerr "Remaining In Handcuffs," Petitioner stated that Inmate Kerr "remained in cuffs of his own free will" and "these orders were only for Saturday 3/8/14 morning and thru [sic] end of shift on Sunday 3/9/14."
 

 80. In his Step 2 Grievance Filing, Petitioner submitted a written "Closing Statement" excusing his actions because of "[t]he lack of a clear procedure deprived me of a concise understanding of what was expected during this type of incident." He also complained that "[n]o one else did anything different [from] what I did but I am the one sitting here with no job while the other OIC's are back to work."
 

 81. [Respondent] presented evidence that as a result of Inmate Kerr's death and the events surrounding it, a total of twenty-five employees faced discipline: nine were dismissed (including an Assistant Superintendent); one was reassigned down (Region Director); one was demoted (Assistant Superintendent); ten received a written warning; two received a TAP entry; and two resigned.
 

 82. On June 3, 2014, the Employee Advisory Committee unanimously recommended that the dismissal be upheld.
 

 83. On July 16, 2014, a Final Agency Decision was issued by Commissioner W. David Guice upholding the dismissal.
 

 84. Based upon all of the admissible evidence, the Undersigned finds as fact that Petitioner did not report a Code Blue incident or ensure that subordinate staff completed a report.
 

 85. Based upon all of the admissible evidence, the Undersigned finds as fact that Petitioner did not complete the daily OIC reports as required of an Officer In Charge.
 

 86. Based upon all of the admissible evidence, the Undersigned finds as fact that Petitioner did not exercise the discretion or good judgment required of a Correctional Captain.
 

 87. Based upon all of the admissible evidence, the Undersigned finds as fact that Petitioner did not ensure the safe and humane treatment of Inmate Kerr.
 

 *225
 
 88. After considering all of the documentary and testimonial evidence submitted in this contested case, taking particular note of the Petitioner's written statements and testimony, the Undersigned finds as fact that Petitioner fails to accept any personal responsibility for his actions or inactions that caused harm to Inmate Kerr.
 

 To summarize, the undisputed evidence and the ALJ's findings establish the following material facts and circumstances:
 

 1. In March 2014 petitioner was a Correctional Captain and acted as the OIC at various times. Petitioner's position required that he not only know and follow prison rules and regulations, but that he respond with discretion and good judgment to situations that were unexpected or were not addressed in written guidelines.
 

 2. On 8 and 9 March 2014 petitioner was the OIC at Alexander, a position that placed him in a supervisory role over the institution and made him responsible for the exercise of good judgment by him and by the staff in order to promote the health and safety of staff and inmates.
 

 3. On 8 March 2014 petitioner ordered that Mr. Kerr must remain in handcuffs until he walked to the door of his cell and asked for their removal. On 8 March 2014 petitioner also ordered that Mr. Kerr should no longer be given milk, leaving Mr. Kerr with no way to drink any liquid unless he could use his handcuffed hands to drink from the sink in his cell.
 

 4. Petitioner did not ensure that the custodial staff checked Mr. Kerr's condition, or that they removed the handcuffs periodically to allow Mr. Kerr to drink or to use the toilet in his cell. Mr. Kerr was not observed to be standing or to have moved from his bed after 8 March 2014.
 

 5. No evidence was presented that Mr. Kerr had ever behaved violently towards custodial staff or that he presented a danger to petitioner or to other staff.
 

 5. Petitioner had the authority to order the handcuffs removed. Procedures existed that would have reduced or eliminated
 
 *528
 
 any risk associated with removing Mr. Kerr's handcuffs.
 
 *226
 
 7. Petitioner's action of allowing Mr. Kerr to remain in metal handcuffs for five days was not in accordance with DPS's or Alexander's guidelines for use of restraints.
 

 Based on the evidence, the ALJ's findings of fact, and the undisputed crucial facts, we conclude that petitioner's actions of (1) allowing Mr. Kerr to remain lying on his bed in handcuffs for five days, (2) without receiving anything to drink during this time, and (3) without any attention to Mr. Kerr's condition, was a violation of applicable rules, a breach of petitioner's responsibility as a senior correctional officer, and contributed directly related to Mr. Kerr's death on 12 March 2014. The ALJ did not err by finding and concluding that respondent had properly determined that it had just cause to terminate petitioner for grossly inefficient job performance.
 

 Petitioner's arguments for a contrary result are primarily technical in nature and ignore the degree of responsibility associated with his position. For example, petitioner argues that the ALJ did not make a finding tracking the statutory language that petitioner "failed to satisfactorily perform job requirements as specified in his job description, work plan, or as directed by management." We first note that as a Correctional Captain, petitioner
 
 was
 
 management. Secondly, the ALJ's findings establish that petitioner's acts and omissions meet the standard for grossly inefficient performance, and the ALJ's order need not be reversed for omitting an additional finding that tracks the statutory language.
 

 Similarly, petitioner contends that the ALJ did not make a finding specifically quoting the definitional language that petitioner's "actions or inactions resulted in the creation of the potential for death or serious bodily injury to Inmate Kerr." The evidence was undisputed that at the time of Mr. Kerr's death he had been in handcuffs for days, with nothing to drink, was lying in his own urine and feces, and was determined to have died of dehydration. In the face of this overwhelming and disturbing evidence, petitioner nonetheless argues that respondent "failed to present sufficient evidence to establish such potential of serious bodily injury or death." We hold that the evidence and the ALJ's findings established not only a
 
 potential
 
 for serious injury or death but death itself.
 

 Petitioner also contends that the "only specific findings that ALJ Brooks made that Petitioner failed to satisfactorily perform his job requirements were those relating to his failure to complete an incident report for the Code Blue incident and his failure to document that Inmate Kerr remained handcuffed at the end of his shift on his daily OIC report." (
 
 PtrBrf 25-26
 
 ) Petitioner fails to acknowledge the most important "job requirement" of
 
 *227
 
 his position, that of exercising good judgment in a supervisory position of great responsibility.
 

 Petitioner also asserts that his conduct, even if it constituted grossly inefficient job performance, did not warrant dismissal. We again note that petitioner's position required him to exercise supervisory authority and good judgment. We conclude that the ALJ's findings support the conclusion that respondent had shown that it had just cause to terminate petitioner for grossly inefficient job performance.
 

 We have considered petitioner's remaining arguments and conclude that they are without merit. For the reasons discussed above, we conclude that the ALJ did not err and that its order should be
 

 AFFIRMED.
 

 Judges BRYANT and CALABRIA concur.